FILED
United States Court of Appeals
Tenth Circuit

**June 8, 2009**

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

JAMES W. GREEN, an individual;
AMERICAN CIVIL LIBERTIES
UNION OF OKLAHOMA, a
non-profit corporation,

      Plaintiffs - Appellants,

v.

HASKELL COUNTY BOARD OF
COMMISSIONERS, also known as
Board of County Commissioners of
Haskell County, Oklahoma; KENNY
SHORT, in his official capacity as
Chairman of the Haskell County Board
of Commissioners,

      Defendants - Appellees,

---

MAINSTREAM BAPTIST
NETWORK; OKLAHOMA
MAINSTREAM BAPTISTS;
AMERICANS UNITED FOR
SEPARATION OF CHURCH AND
STATE; AMERICAN CENTER FOR
LAW AND JUSTICE; THE
NATIONAL LEGAL FOUNDATION;
AMERICAN LEGION # 182; and
FOUNDATION FOR MORAL LAW,

      Amici Curiae.

No. 06-7098

**Appeal from the United States District Court
for the Eastern District of Oklahoma
(D.C. No. 05-CV-406-RAW)**

Daniel Mach, American Civil Liberties Union Foundation, Washington, D.C. (Lane Dilg, American Civil Liberties Union Foundation, Washington, D.C.; Micheal Salem, Salem Law Offices, Norman, Oklahoma; Tina L. Izadi, American Civil Liberties Union of Oklahoma Foundation, Oklahoma City, Oklahoma, with him on the briefs), for Plaintiffs-Appellants.

Kevin H. Theriot (Joel L. Oster, with him on the brief), Alliance Defense Fund, Leawood, Kansas, for Defendants-Appellees.

Harry F. Tepker, University of Oklahoma Law Center, Norman, Oklahoma, filed an amicus curiae brief for Mainstream Baptist Network and Oklahoma Mainstream Baptists in support of Plaintiffs-Appellants.

Ayesha N. Khan, Richard B. Katskee, and Heather L. Weaver, Americans United for Separation of Church and State, Washington, D.C., filed an amicus curiae brief for Americans United for Separation of Church and State in support of Plaintiffs-Appellants.

Jay Alan Sekulow, American Center for Law & Justice, Washington, D.C.; Francis J. Manion and Geoffrey R. Surtees, American Center for Law & Justice, New Hope, Kentucky, filed an amicus curiae brief for American Center for Law and Justice in support of Defendants-Appellees.

Philip B. Onderdonk Jr., The American Legion, Indianapolis, Indiana; Kelly J. Shackelford and Hiram S. Sasser III, Liberty Legal Institute, Plano, Texas, filed an amicus curiae brief for The American Legion # 182 in support of Defendants-Appellees.

Steven W. Fitschen and Barry C. Hodge, Virginia Beach, Virginia, filed an amicus curiae brief for The National Legal Foundation in support of Defendants-Appellees.

Roy S. Moore, Gregory M. Jones, and Benjamin D. DuPré, Foundation for Moral Law, Montgomery, Alabama, filed an amicus curiae brief for Foundation for Moral Law in support of Defendants-Appellees.

Before **HARTZ**, **O'BRIEN**, and **HOLMES**, Circuit Judges.

**HOLMES**, Circuit Judge.

Defendant-Appellee Haskell County Board of Commissioners approved a constituent's request to erect a monument displaying the Ten Commandments (hereinafter the "Monument") on the lawn of the county courthouse in Stigler, Oklahoma. Plaintiffs-Appellants James Green, a Haskell County resident, and the American Civil Liberties Union ("ACLU") of Oklahoma filed suit against the Haskell County Board of Commissioners and Kenny Short, in his official capacity as chairman of that board, (collectively "the Board") under 42 U.S.C. § 1983, alleging a violation of the Establishment Clause of the First Amendment. After a bench trial, the district court ruled in favor of the Board, finding no constitutional violation in the Monument's placement on the courthouse lawn.

Exercising our jurisdiction under 28 U.S.C. § 1291,[1] we hold that, under the

---

[1]    The National Legal Foundation, as amicus curiae, challenges our jurisdiction, arguing that 42 U.S.C. § 1983 is not a proper vehicle to address Establishment Clause violations. Because we are required to ascertain our jurisdiction, we may consider jurisdictional arguments raised by amici. *See Wyo. Farm Bureau Fed'n v. Babbitt*, 199 F.3d 1224, 1230 n.2 (10th Cir. 2000). The National Legal Foundation argues that an Establishment Clause violation is not a "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" for which § 1983 provides redress. 42 U.S.C. § 1983; Nat'l Legal Found. Amicus Br. at 11. It argues that § 1983 was enacted to vindicate civil rights and that the statute's history, grounded in the history of similar language in
(continued...)

unique circumstances presented here, the Establishment Clause was violated

because the reasonable observer would view the Monument as having the

impermissible principal or primary effect of endorsing religion.  Accordingly, we

**REVERSE** the district court's order.

---

[1](...continued)
the Fourteenth Amendment, demonstrates that "freedom from establishment" was
not intended to be treated as such a "right" or one of the Fourteenth Amendment
"privileges or immunities" privately enforceable under § 1983.  Nat'l Legal
Found. Amicus Br. at 6-10.

The Establishment Clause protects religious liberty no less than the Free
Exercise Clause does.  *See Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 313
(2000) (declaring that "the common purpose of the Religion Clauses 'is to secure
religious liberty'" (quoting *Engel v. Vitale*, 370 U.S. 421, 430 (1962))); Michael
W. McConnell, *Accommodation of Religion*, 1985 Sup. Ct. Rev. 1, 1 (observing
that "religious liberty is the central value and animating purpose of the Religion
Clauses").  The Supreme Court's application of the Establishment Clause to the
states through the Fourteenth Amendment implicitly determined that individual
rights were at stake.  *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940)
(noting that "[t]he fundamental concept of liberty embodied in [the Fourteenth]
Amendment embraces the liberties guaranteed by the First Amendment," making
"the legislatures of the states as incompetent as Congress to enact" laws
"respecting an establishment of religion or prohibiting the free exercise thereof");
*see also Everson v. Bd. of Educ.*, 330 U.S. 1, 15 (1947) (giving "the same
application and broad interpretation to the 'establishment of religion' clause" as
*Cantwell* had applied to the Free Exercise Clause).  And the Supreme Court has
rejected the notion that § 1983's scope is limited to civil rights or equal
protection laws.  *Maine v. Thiboutot*, 448 U.S. 1, 6-8 (1980) (interpreting the "and
laws" portion of § 1983's grant of jurisdiction).  In that light, it is unsurprising
that both the Supreme Court and this court repeatedly have, without comment,
decided § 1983 actions alleging Establishment Clause violations.  *See, e.g.*,
*McCreary County, Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 852
(2005); *Van Orden v. Perry*, 545 U.S. 677, 682 (2005); *Lamb's Chapel v. Ctr.
Moriches Union Free Sch. Dist.*, 508 U.S. 384, 389 (1993); *Marsh v. Chambers*,
463 U.S. 783, 785 (1983); *O'Connor v. Washburn Univ.*, 416 F.3d 1216, 1220
(10th Cir. 2005).  In sum, we have no basis to doubt our jurisdiction.

# I. BACKGROUND[2]

Haskell County has a population of about 15,000 people. Approximately 2500 people live in the county seat, Stigler. The Haskell County courthouse is located in Stigler. It sits in the middle of approximately one square block of county property. The courthouse contains the courts, the offices of numerous government officials, and county offices where citizens can perform a variety of activities such as voting, paying taxes, and accessing public records.

The Haskell County Historical Society occupies a log cabin in the northeast corner of the property. Outside of the courthouse are monuments of various sorts, most of which were paid for and erected by private citizens. One sidewalk contains personal message bricks. Two benches are dedicated to and inscribed by the Classes of 1954 and 1955, respectively. The largest monument—honoring Haskell County citizens who died in World Wars I and II—sits in the middle of the lawn. In front of it are smaller monuments honoring those killed in action in Vietnam and Korea. A small rose garden with a birdbath sits behind the World Wars monument. A monument honoring the Choctaw Nation and a monument honoring all unmarked graves in Haskell County also are situated on the courthouse lawn.

At issue is a recent addition to the lawn—a block of stone that is

---

[2] Our recitation of the facts relies largely on the district court's factual findings in its opinion issued after the bench trial. *See Green v. Bd. of County Comm'rs of County of Haskell*, 450 F. Supp. 2d 1273 (E.D. Okla. 2006).

approximately eight feet tall and three feet wide, with the Ten Commandments

inscribed on one side and the Mayflower Compact on the other.  Photographs of

the two sides of the Monument are appended to this opinion as Appendix A (Ten

Commandments) and Appendix B (Mayflower Compact).  The side facing the

street reads:

The Ten Commandments

| | |
|---|---|
| I | Thou shalt have no other gods before me. |
| II | Thou shalt not make unto thee any graven image. |
| III | Thou shalt not take the name of the Lord thy God in vain. |
| IV | Thou shalt remember the sabbath day and keep it holy. |
| V | Thou shalt honor thy father and mother. |
| VI | Thou shalt not kill. |
| VII | Thou shalt not commit adultry. [sic] |
| VIII | Thou shalt not steal. |
| IX | Thou shalt not bear false witness against thy neighbor. |
| X | Thou shalt not covet thy neighbor's house. |

Exodus 20

App. at 1569.

The opposite side of the Monument reads, in all capital letters:

The Mayflower Compact<br>November 11, 1620

In the name of God, Amen.

We whose names are underwritten, the loyal subjects of our
dread sovereign Lord, King James by the grace of God, of
Great Britain, France and Ireland king, defender of the faith,
ect. [sic], having undertaken, for the glory of God, and
advancement of the Christian faith, and honor of our king and
country, a voyage to plant the first colony in the Northern

parts of Virginia, do by these presents solemnly and mutually in the presence of God, and one of another, covenant and combine ourselves together into a civil body politic, for our better ordering and preservation and furtherance of the ends aforesaid; and by virtue hereof to enact, constitute, and frame such just and equal laws, ordinances, acts, constitutions, and offices, from time to time, as shall be thought most meet and convenient for the general good of the colony, unto which we promise all due submission and obedience.

In witness whereof we have hereunder subscribed our names at Cape-Cod the 11 of November, in the year of the reign of our sovereign lord, King James, of England, France, and Ireland the eighteenth, and of Scotland the fifty-fourth. Anno Domini 1620.

App. at 1566. At the base of the Monument is a notation added after the start of this litigation: "Erected by Citizens of Haskell County." App. at 1085; *see Green*, 450 F. Supp. 2d at 1277-78.

The Monument's saga began when Michael Bush, a local citizen who is employed as a construction worker and part-time minister, appeared at a regularly scheduled Board meeting to seek approval for placing a Ten Commandments monument on the courthouse lawn. At that time, the Board consisted of three commissioners. After a brief discussion, they approved Mr. Bush's request. The relevant portion of the meeting's minutes reads: "The Board met with Mike Bush to discuss getting a monument with the 10 Commandments on it to put on the courthouse lawn. The Board agreed that Mike could go ahead and have the monument made and Mike is taking care of all the expense." App. at 1388.

Mr. Bush recalled telling the Board that "the Lord had burdened [his]

heart" to create the Monument and that he would be responsible for raising the funds and getting the Monument. App. at 1013. He did not present the Board with any diagram of his proposal, although he did describe its proposed size and that it would depict the Ten Commandments. Mr. Bush did not recall being asked any questions before the Board approved his request. One of the commissioners recalled discussing the historical aspects of the Monument with the other commissioners but could not recall any more specific contents of that discussion. Either prior to or shortly after the vote, the Board consulted with the County's attorney, who informed them that a decision to approve the Monument could result in a few legal "bumps." App. at 516, 1148.

After receiving approval from the Board, Mr. Bush raised the necessary funds through religious groups in the community. With the assistance of a friend, Mr. Bush decided on the wording of the Ten Commandments to appear on the Monument, condensing and paraphrasing from the King James Version of the Bible.[3] At some point in the process of designing the Monument, Mr. Bush

---

[3] In our subsequent legal analysis, we place no significance on the fact—suggested by the district court, *Green*, 450 F. Supp. 2d at 1277-78 & n.7—that this may be "a butchered paraphrase" of the King James Version. *Id.* at 1278. Along with numerous other considerations, we focus on the Monument's text (irrespective of its biblical pedigree) and its likely effect on a reasonable observer. According to Mr. Green, the *particular version* of the Ten Commandments inscribed on the Monument is "uniquely Christian" and "contains expressly sectarian and religious commands, such as observing the Sabbath, not worshiping idols, believing in a deity, and not taking a deity's name in vain." App. at 22. Mr. Green apparently seeks to draw a beneficial contrast with

(continued...)

decided to include the Mayflower Compact as well. As it relates to the Ten

Commandments, the Board did not review or approve Mr. Bush's design of the

Monument or the version of the Ten Commandments that he selected to be

inscribed on it. With regard to the Mayflower Compact, the Board apparently was

not apprised of Mr. Bush's plan to add it to the Monument and did not authorize

him to do so.[4]

The Board, however, did select the location for the monument—in line with

several of the other monuments on the lawn, approximately twenty-five feet away

from Highway 9 (the main thoroughfare through town, which runs in front of the

courthouse), five feet over from the unmarked graves monument, and fifty feet

from the World Wars monument in the center of the lawn. The location does not

---

[3](...continued)
monuments found in other Ten Commandments cases that purport to depict a more interfaith version of the Ten Commandments. *See ACLU Neb. Found. v. City of Plattsmouth, Neb.*, 419 F.3d 772, 774 n.2 (8th Cir. 2005) (en banc) ("The monument lists eleven commands ostensibly to serve as an amalgamation of the Jewish, Protestant, and Catholic versions of the Ten Commandments."); *Books v. City of Elkhart, Ind.*, 235 F.3d 292, 294 (7th Cir. 2000) ( "[R]epresentatives of Judaism, Protestantism, and Catholicism developed what the individuals involved believed to be a nonsectarian version of the Ten Commandments because it could not be identified with any one religious group."). However, we offer no view concerning the validity of Mr. Green's characterization of the version of the Ten Commandments inscribed on the Monument. In our view, this factor is not a material consideration in our disposition under the facts of this case.

[4]     Although the district court found that the record was "irredeemably ambiguous" concerning whether the Board knew about or approved the addition of the Compact, the court ultimately was "not convinced" that the Board "ever officially approved the addition of the Compact." *Green*, 450 F. Supp. 2d at 1291 n.30.

appear to be "a clearly high traffic area" and not "the most frequented route taken to the courthouse by citizens going there to undertake business." *Green*, 450 F. Supp. 2d at 1294. A sketch of the courthouse lawn that sheds some light on the Monument's location and its spatial relationship with the other monuments is appended to this opinion as Appendix C. *See id.* at 1277 n.6 (describing the sketch and noting that "a not-to-scale diagram showing the approximate location of the monuments on the lawn was helpful and was admitted" into evidence).

On November 5, 2004, the Monument actually was placed on the lawn. It remained covered until a dedication ceremony was held on Sunday, November 7. This ceremony was organized by Mr. Bush, who informed the churches that had participated in the fundraising effort for the Monument that it would be taking place. One to two hundred people, including two of the three commissioners, attended the ceremony, and seventeen churches were represented. The ceremony, which lasted for about one hour, opened with a prayer and included remarks by local pastors. Mr. Bush also explained how the Monument came to be on the courthouse lawn. Although Mr. Bush recalled that the commissioners also said a few words, neither commissioner recalls doing anything other than attending the ceremony.

For several months following its unveiling, the Monument attracted significant media attention. Photographs of commissioners posing near the Ten Commandments appeared in newspapers distributed in Haskell County. In some

of the photographs, two of the three commissioners were present. And, in at least one photograph, all three were present. That photograph (featuring all three commissioners) was introduced into evidence and is appended to this opinion as Appendix D. At least two of the commissioners expressed a recognition that they were asked by the media to participate in the photographs because of their status as commissioners.

The media also quoted the commissioners making statements about the Monument. In November 2004, one commissioner, referring to the Ten Commandments, stated: "That's what we're trying to live by, that right there . . . . The good Lord died for me. I can stand for him, and I'm going to. . . . I'm a Christian and I believe in this. I think it's a benefit to the community." App. at 455. Around the same time, that commissioner (in substance) told another media outlet: "God died for me and you, and I'm going to stand up for him." App. at 458-59.

Mr. Green and the ACLU of Oklahoma filed suit on October 6, 2005, alleging that the display of the Ten Commandments on the courthouse lawn violated the Establishment Clause. They sought a declaration that the Ten Commandments display was unconstitutional and also "prospective injunctive relief, requiring Defendants to remove the large religious monument from the lawn of the Haskell County Courthouse." App. at 16-17. They did not assert a claim for monetary relief.

Mr. Green stated that he was offended by what he perceived as the Monument's mandates because he does "not feel that [he] should be told [he is] bound by them," as they did not come through the democratic process, and because he "subscribe[s] to the later teachings of Jesus" and rejects this text from "a period of harsh, almost terroristic origins." App. at 946. He was concerned by the commissioners' statements about the Monument because "they seemed to be strongly supporting the religious aspects of the monument as a body," and he fears that he will be "treated differently and more harshly" because he does not "subscribe to a particular faith that is represented by this monument." App. at 938-39, 951. He said that he cannot avoid the Monument when he conducts his business at the courthouse.

Following the initiation of this lawsuit, Mr. Bush organized a rally and circulated a petition to support the Monument. To advertise the rally, posters encouraged community members to "Support the Ten Commandments Monument" and depicted a young girl praying before an American flag with the caption "One Nation Under God." App. at 1409, 1534. One such poster was placed on the front door of the courthouse. The rally was held on the courthouse lawn on November 19, 2005, and attended by approximately three to four hundred people. There were a number of speakers at the rally, including local pastors and a U.S. Senator. One commissioner acknowledged saying at the rally, in effect, "I'll stand up in front of that monument and if you bring a bulldozer up here you'll

have to push me down with it." App. at 1405, 1186; *see also Green*, 450 F. Supp.

2d at 1280 (noting that "[n]o recording exists" of the commissioner's statement

but he "was reported to have said something like" the bulldozer comment).

Furthermore, on May 6, 2006, the Board enacted a policy that prohibited Haskell

County from denying placement of a display on the courthouse lawn based on

viewpoint.

The district court held a two-day bench trial in May 2006. After reviewing

the evidence presented and visiting the Haskell County Courthouse to view the

Monument, the district court found in favor of the defendants. This appeal

followed.

## II. DISCUSSION

### *A. Standing*

"Because it involves the court's power to entertain the suit, constitutional

standing is a threshold issue in every case before a federal court." *O'Connor*, 416

F.3d at 1222. We review the question of whether a plaintiff has constitutional

standing de novo. *United States v. $148,840 in U.S. Currency*, 521 F.3d 1268,

1273 (10th Cir. 2008). "[T]he irreducible constitutional minimum of standing

contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560

(1992). First, the plaintiff must have suffered a concrete, actual "injury in fact."

*Id.* Second, there must be a causal connection between the injury and the conduct

at issue. *Id.* Third, it must be likely that a favorable decision will redress the

plaintiff's injury.  *Id.* at 561.  Mr. Green meets all three requirements.[5]

In the context of alleged Establishment Clause violations, a plaintiff may establish non-economic injury if "'directly affected by the laws and practices against which their complaints are directed.'"  *O'Connor*, 416 F.3d at 1222-23 (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 486 n.22 (1982)).  Although "the psychological consequence presumably produced by observation of conduct with which one disagrees" is not a sufficient injury in fact, *Valley Forge*, 454 U.S. at 485, we have held that "[a]llegations of personal contact with a state-sponsored image suffice to demonstrate this kind of direct injury."  *O'Connor*, 416 F.3d at 1223 (citing *Foremaster v. City of St. George*, 882 F.2d 1485, 1490-91 (10th Cir.

---

[5]  The district court determined that the ACLU of Oklahoma lacked standing for failure to allege all the elements required of an associational plaintiff.  *Green*, 450 F. Supp. 2d at 1286 (citing *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).  Plaintiffs-Appellants do not challenge this conclusion in any substantial fashion, only noting in a footnote that "although it is unnecessary for this appeal, the ACLU of Oklahoma also has constitutional standing to challenge the display," and arguing that we should take judicial notice of the organization's readily identifiable mission.  Aplt. Opening Br. at 22 n.7.  Because we conclude that Mr. Green has standing, we agree that it is unnecessary to address the ACLU of Oklahoma's standing.  However, to the extent that Plaintiffs-Appellants intended to challenge the district court's exclusion of the ACLU of Oklahoma, their argument is inadequately raised for appellate review, and we will not address it.  *See United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002) (en banc) ("Arguments raised in a perfunctory manner, such as in a footnote, are waived.").  Furthermore, as the party invoking federal jurisdiction, the ACLU of Oklahoma must do more than describe its objection to the district court's determination; to carry its burden, it must establish each element of standing.  *Lujan*, 504 U.S. at 561.  Thus, we review only the Board's challenge to Mr. Green's standing.

1989)); *Weinbaum v. City of Las Cruces, N.M.*, 541 F.3d 1017, 1028 (10th Cir. 2008) (restating *O'Connor*'s rule that in Establishment Clause cases, such allegations of personal contact are sufficient to demonstrate direct injury); *see also Vasquez v. L.A. County*, 487 F.3d 1246, 1252 (9th Cir. 2007) ("We note that the majority of other circuits that have considered the issue have held spiritual harm resulting from one's direct contact with an offensive religious (or anti-religious) symbol to be a sufficient basis to confer Article III standing.").

In *O'Connor*, plaintiffs had to walk past the offensive statue "almost every week" or alter their routes across campus. *O'Connor*, 416 F.3d at 1223. In *Weinbaum*, the plaintiffs alleged that they had direct contact with the cross symbol that the city used as its seal, in that it was conspicuously displayed on city property. *Weinbaum*, 541 F.3d at 1028. In *Foremaster*, plaintiff alleged that he was "confronted by the [offending city] logo on a daily basis." *Foremaster*, 882 F.2d at 1491. Mr. Green testified that he visits the Haskell County Historical Society on a weekly basis and that business occasionally takes him to the courthouse. Further, Mr. Green testified that whenever he visits the courthouse square for either purpose, he cannot avoid the Monument. We conclude that Mr. Green's statements are sufficient to establish that he is being "frequently brought into direct and unwelcome contact with" the structure allegedly giving rise to the Establishment Clause violation (i.e., the Monument). *O'Connor*, 416 F.3d at 1223. Thus, Mr. Green meets the injury-in-fact requirement of standing.

The second element of constitutional standing, a causal connection, is not disputed and is easily met here: Mr. Green's Establishment Clause claim is based on the Board's approval of and support for the Monument that allegedly caused his injury. Turning to the third element, the Board argues that Mr. Green's injury cannot be redressed by a favorable decision because his argument should be construed as primarily evidencing an opposition to the *comments* that certain commissioners made regarding the Monument, not the *Monument* itself, and that Mr. Green has not sought damages or an injunction restricting such statements by the commissioners.

This argument must fail. While the district court did note that there were inconsistencies in Mr. Green's testimony as to whether he was more offended by the Monument itself or by commissioners' statements about the Monument, *Green*, 450 F. Supp. 2d at 1282, from the outset of the lawsuit Mr. Green has challenged the Monument, and his alleged injury in that regard is redressable. While Mr. Green might not have a remediable injury if he were objecting to the past comments of commissioners in isolation, it is the Monument itself that gave rise to his Establishment Clause challenge, and Mr. Green primarily referred to the comments because they (allegedly) indicate governmental endorsement of religion through the Monument. The court-ordered removal of the Monument that Mr. Green seeks would redress his injury. Accordingly, we conclude that Mr. Green has standing to bring his claim.

## B. Mootness

Like standing, mootness is a threshold inquiry. *Navani v. Shahani*, 496 F.3d 1121, 1127 (10th Cir. 2007), *cert. denied*, 128 S. Ct. 1232 (2008); *see Citizens for Responsible Gov't State Political Action Comm. v. Davidson*, 236 F.3d 1174, 1182 (10th Cir. 2000) (noting that "the court must determine whether a case is moot before proceeding to the merits"). "A case or controversy must remain alive throughout the litigation, including on appellate review." *Navani*, 496 F.3d at 1127. "If, during the pendency of the case, circumstances change such that the plaintiff's legally cognizable interest in a case is extinguished, the case is moot, and dismissal may be required." *Kan. Judicial Review v. Stout*, 562 F.3d 1240, 1245 (10th Cir. 2009). The Board argues that its new policy that prohibits Haskell County from denying placement of a display on the courthouse lawn based on viewpoint constitutes just such a circumstance, rendering this case moot.

"In deciding whether a case is moot, '[t]he crucial question is whether granting a present determination of the issues offered . . . will have some effect in the real world.'" *Id.* at 1246 (alteration in original) (quoting *Davidson*, 236 F.3d at 1182); *see Phelps v. Hamilton*, 122 F.3d 885, 891 (10th Cir. 1997) (noting that the "inability to grant effective relief renders" an issue moot). To the extent that the Board characterizes this case as merely a challenge to the unwritten policy regarding placement of displays on the courthouse lawn, the assertion is belied by

the very portion of the complaint that they cite. It charges that the Board's "'acts, practices, and policies constitute an impermissible endorsement.'" Aplee. Br. at 25 (quoting App. at 25). The Board's implementation of its May 2006 policy does not alter the previous actions of the Board; nor does it change the Board's alleged endorsement of religion through the Monument. Mr. Green has sought a declaration that Board's actions resulting in the erection of the Ten Commandments display were unconstitutional. *See* App. at 731 (amended pretrial order noting that plaintiffs "seek declaratory relief that the Ten Commandments Monument and its placement on Haskell County Courthouse law violates the Establishment Clause").

Moreover, insofar as the Board's mootness assertion rests on the ground that, regardless of the outcome of this case, its 2006 written policy would oblige it to accept an identical monument for display, the assertion is untenable. The possibility that a future monument installed under different circumstances might pass constitutional muster does not moot the present case. We are unable to decide that hypothetical case on the facts before us. *See O'Connor*, 416 F.3d at 1222 ("Although it is conceivable that the university could bring some other religiously themed statue onto campus as part of a future sculpture exhibition, this court cannot resolve the constitutionality of a hypothetical future statue given that Establishment Clause questions are heavily dependent on the specific context and content of the display."). The Monument remains on the courthouse lawn; at

bottom, Mr. Green's lawsuit seeks its removal. Therefore, Mr. Green has a legally cognizable interest in this litigation's outcome. For the foregoing reasons, then, we conclude that this case presents a live case or controversy and is not moot.

### C. Establishment Clause Claim

### 1. Standard of Review

Ordinarily, we "review the district court's factual findings, made after a bench trial, for clear error[,] and its legal conclusions *de novo*." *Orient Mineral Co. v. Bank of China*, 506 F.3d 980, 1001 (10th Cir. 2007), *cert. denied*, 128 S. Ct. 2872 (2008); *see also* Fed. R. Civ. P. 52(a)(6).[6] However, in a First Amendment case, we have an "obligation to make an independent examination of the whole record." *Snyder v. Murray City Corp.*, 159 F.3d 1227, 1230 n.7 (10th Cir. 1998) (en banc) (internal quotation marks omitted) (citing *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984)); *Weinbaum*, 541 F.3d at 1029. "We review *de novo* a 'district court's finding of constitutional fact' and its 'ultimate conclusions' regarding a First Amendment challenge."[7] *Weinbaum*,

---

[6]    Rule 52(a)(6) provides: "Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility."

[7]    In *Bose*, the Supreme Court concluded that "the strictures of Federal Rule of Civil Procedure 52(a) did not apply to a district court's conclusion that an alleged libeler had 'actual malice' because the determination was a 'First

(continued...)

541 F.3d at 1029 (quoting *Fleming v. Jefferson County Sch. Dist. R-1*, 298 F.3d 918, 922 (10th Cir. 2002)).  More specifically, in Establishment Clause cases, we consider "a district court's findings on each part of the *Lemon* test" to be "constitutional facts."  *Robinson v. City of Edmond*, 68 F.3d 1226, 1230 n.7 (10th Cir. 1995) (applying the test derived from *Lemon v. Kurtzman*, 403 U.S. 602 (1971)).  We must still give "due regard," however, to the trial judge's opportunity to observe the demeanor of witnesses.  *Bose*, 466 U.S. at 499-500, 514.

Furthermore, our searching review of the record with regard to "constitutional facts" does not alter our ordinary clearly-erroneous review of the district court's other factual findings.  *See id.* at 514 n.31 ("The independent review function is not equivalent to a 'de novo' review of the ultimate judgment itself, in which a reviewing court makes an original appraisal of all the evidence to decide whether or not it believes that judgment should be entered for plaintiff.").  "[T]he special *Bose* rule applies only to 'constitutional facts' and not to the basic historical facts upon which the claim is grounded, which are subject to the usual 'clearly erroneous' standard of review." *Friday*, 525 F.3d at 950 (applying *Bose* to a Free Exercise Clause claim).  While it may be difficult at

---

[7](...continued)
Amendment question[] of constitutional fact.'" *United States v. Friday*, 525 F.3d 938, 949 (10th Cir. 2008) (quoting *Bose*, 466 U.S. at 508 n.27), *cert. denied*, 129 S. Ct. 1312 (2009); *see generally* Henry P. Monaghan, *Constitutional Fact Review*, 85 Colum. L. Rev. 229 (1985).

times to distinguish historical facts from constitutional facts, we will give deference to the district court's ordinary factual findings and more closely review its conclusions about "purpose," "effect," and "entanglement."

## 2. The Lemon Test

The Religion Clauses of the First Amendment provide that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. Like other provisions of the First Amendment, they are applied to the states under the Fourteenth Amendment. *Cantwell*, 310 U.S. at 303. "Despite scattered signals to the contrary, the touchstone for Establishment Clause analysis remains the tripartite test set out in *Lemon*." *Weinbaum*, 541 F.3d at 1030 (footnote omitted); *see Utah Gospel Mission v. Salt Lake City Corp.*, 425 F.3d 1249, 1258-59 (10th Cir. 2005) (noting that we deem the *Lemon* test to be the "traditional standard" for evaluating Establishment Clause claims). Under that test, to avoid an Establishment Clause violation, the challenged government action (1) must have a secular legislative purpose, (2) must have a principal or primary effect that neither advances nor inhibits religion, and (3) must not foster an excessive government entanglement with religion. *Utah Gospel Mission*, 425 F.3d at 1259 (citing *Lemon*, 403 U.S. at 612-13).

Justice O'Connor's concurring opinion in *Lynch v. Donnelly*, 465 U.S. 668, 687-94 (1984) (O'Connor, J., concurring), offered "a refined version of the

*Lemon* test" implicating its purpose and effect elements that has been repeatedly used in this circuit. *O'Connor*, 416 F.3d at 1224 ("In examining challenges to government action under the Establishment Clause, this circuit has interpreted the purpose and effect prongs of *Lemon* in light of Justice O'Connor's endorsement test."); *see Weinbaum*, 541 F.3d at 1030; *Bauchman ex rel. Bauchman v. W. High Sch.*, 132 F.3d 542, 551 (10th Cir. 1997). This "endorsement test" holds that "the government impermissibly endorses religion if its conduct has either (1) the purpose or (2) the effect of conveying a message that religion or a particular religious belief is favored or preferred." *Bauchman*, 132 F.3d at 551 (internal quotation marks omitted).

We are obliged here to apply the *Lemon* test, with Justice O'Connor's endorsement patina. *See Weinbaum*, 541 F.3d at 1030 (noting our obligation to apply the "hybrid *Lemon*/endorsement test"); *O'Connor*, 416 F.3d at 1224 ("This court will therefore continue to apply the *Lemon* test as modified by Justice O'Connor's endorsement test, while remaining mindful that there is 'no test-related substitute for the exercise of legal judgment.'" (quoting *Van Orden*, 545 U.S. at 700 (Breyer, J., concurring)).[8] A governmental action violates the

---

[8] A plurality of the Supreme Court has (a) concluded that the *Lemon* test is "not useful in dealing with the sort of passive [Ten Commandments] monument that Texas has erected on its Capitol grounds," (b) disregarded the endorsement test, and (c) instead employed an analysis "driven both by the nature of the monument and by our Nation's history." *Van Orden*, 545 U.S. at 686 (plurality opinion). Justice Breyer concurred in the judgment, noting that "the

(continued...)

Court has found no single mechanical formula that can accurately draw the constitutional line in every case" and declaring that in borderline cases there is "no test-related substitute for the exercise of legal judgment." *Id.* at 699-700 (Breyer, J., concurring). In *Weinbaum*, we observed that certain Supreme Court Justices have "harshly criticized" the *Lemon* test. *Weinbaum*, 541 F.3d at 1030 n.14. However, we ultimately concluded that we are still obliged to apply *Lemon*, as refined by Justice O'Connor's endorsement test: "[T]he Lemon test clings to life because the Supreme Court, in the series of splintered Establishment Clause cases since *Lemon*, has never explicitly overruled the case. While the Supreme Court may be free to ignore *Lemon*, this court is not." *Id.* (citation omitted); *see also* Edith Brown Clement, *Public Displays of Affection . . . For God: Religious Monuments After* McCreary *and* Van Orden, 32 Harv. J.L. & Pub. Pol'y 231, 246 (2009) [hereinafter Clement, *Public Display*s] ("Most courts of appeals have concluded that the *Lemon* tripartite test of purpose, effect, and entanglement still stands after *Van Orden*, yet this conclusion has not come without a struggle."). Therefore, we cannot do as the Board wishes, *see* Aplee. Br. at 38, 45-46 n.21, and be guided in our analysis by the *Van Orden* plurality's disregard of the *Lemon* test.

The Board also has argued that Establishment Clause jurisprudence should not apply here at all and that this case should be analyzed under the legal framework of the Free Exercise Clause. "The Free Speech Clause restricts government regulation of *private* speech; it does not regulate government speech." *Pleasant Grove City, Utah v. Summum*, 129 S. Ct. 1125, 1131 (2009) (emphasis added). As a logical and necessary support for its argument, the Board thus maintains that the Monument should be viewed as private speech rather than government speech. The Supreme Court's recent *Pleasant Grove* decision, however, forecloses this argument. There, the Court held that "[p]ermanent monuments displayed on public property typically represent government speech" and, therefore, Free Exercise Clause jurisprudence is inapposite. *Id.* at 1132. The Board notes that the Supreme Court did not say that *all* permanent monuments constitute government speech—just that they *typically* do—and that the Board has intentionally opened a limited public forum for monuments on the courthouse lawn. We are hard-pressed to view the circumstances here as resembling the "limited circumstances in which the forum doctrine might properly be applied to a permanent monument," as described by the *Pleasant Grove* Court. *Id.* at 1138 (noting that such "limited circumstances" might be present, "for example, if a town created a monument on which all of its residents (or all those meeting some

Establishment Clause if it fails to satisfy *any* of three prongs of the *Lemon* test.

*See Utah Gospel Mission*, 425 F.3d at 1259 ("Thus, to succeed, Plaintiffs must allege facts which suggest a violation of *any* part of the [*Lemon*] analysis." (emphasis added)); *Bauchman*, 132 F.3d at 551 (noting that governmental action does not run afoul of the Establishment Clause "so long as" it satisfies all three prongs of the *Lemon* test); *see also O'Connor*, 416 F.3d at 1224 (relying on *Bauchman* in noting the need for the challenged governmental action to satisfy all three *Lemon* prongs).

Mr. Green's arguments do not implicate the third prong of the *Lemon* test. That is, Mr. Green does not contend on appeal that the Board's conduct in relation to the Ten Commandments display fosters an excessive government entanglement with religion. He does argue, however, that the Board's conduct in connection with the Ten Commandments display fails to satisfy *Lemon*'s first and second prongs. For the reasons stated below, we ultimately conclude that the Board's

---

(...continued)
other criterion) could place the name of a person to be honored or some other private message"). This is simply not one of those "situations in which it is difficult to tell whether a government entity is speaking on its own behalf or is providing a forum for private speech." *Id.* at 1132. However, as the Court noted: "This does not mean that there are no restraints on government speech. For example, government speech must comport with the Establishment Clause." *Id.* at 1131-32; *see id.* at 1139 (Stevens, J., concurring) ("For even if the Free Speech Clause neither restricts nor protects government speech, government speakers are bound by the Constitution's other proscriptions, including those supplied by the Establishment and Equal Protection Clauses."). And it is the propriety of the Board's action under the Establishment Clause that is properly before us here.

action does violate the Establishment Clause with respect to the second prong. In other words, we conclude that the principal or primary effect of the Board's action is to endorse religion or a particular form of religion. Accordingly, we need not (and do not) opine on whether the Board's action satisfies the first *Lemon* prong (i.e., whether the Board's purpose was secular).

### 3. Application

### *i. The Monument Is Not Presumptively Unconstitutional*

"Establishment Clause cases are predominantly fact-driven . . . ." *Weinbaum*, 541 F.3d at 1022. We reject at the outset Mr. Green's argument that "[g]overnmental [d]isplays of the [t]ext of the Ten Commandments [a]re [p]resumptively [u]nconstitutional." Aplt. Opening Br. at 24. In *Stone v. Graham*, 449 U.S. 39, 41 (1980), the Supreme Court observed that "[t]he pre-eminent purpose for posting the Ten Commandments on schoolroom walls is plainly religious in nature." In *McCreary*, the Court construed that language to mean that isolated exhibition in public school classrooms "could presumptively be understood as meant to advance religion." *McCreary*, 545 U.S. at 867. However, *McCreary* did not adopt a general presumption outside of that school context: Specifically, it noted that "*Stone* did not purport to decide the constitutionality of every possible way the Commandments might be set out by the government, and under the Establishment Clause detail is key." *Id.*; *see also Van Orden*, 545 U.S. at 690-91 (construing *Stone* as an example of "particular[] vigilan[ce] in

monitoring compliance with the Establishment Clause in elementary and secondary schools" (internal quotation marks omitted)); *id.* at 703 (Breyer, J., concurring) (distinguishing *Stone* on the basis that "given the impressionability of the young, government must exercise particular care in separating church and state" on the grounds of a public school).

The Ten Commandments have a secular significance that government may acknowledge. *See Van Orden*, 545 U.S. at 688-89 (plurality opinion) (providing examples showing that "acknowledgments of the role played by the Ten Commandments in our Nation's heritage are common throughout America" and observing that the Court's "opinions, like our building, have recognized the role the Decalogue plays in America's heritage"); *id.* at 701 (Breyer, J., concurring) (noting that in certain contexts the Commandments can convey "a secular moral message . . . about proper standards of social conduct" or a message "about a historic relation between those standards and the law"). Like the *McCreary* Court, we are unwilling to presume that the text of the Ten Commandments here could not be constitutionally integrated into a governmental display that highlights its secular significance. *See McCreary*, 545 U.S. at 874 (expressly declining to hold that "a sacred text can never be integrated constitutionally into a governmental display on the subject of law, or American history").[9]  Accordingly,

_____

[9]  In fact, the closest the *McCreary* Court came to a presumption against a display of the Ten Commandments is its conclusion that "a religious

(continued...)

- 26 -

we reject Mr. Green's contention that we should deem the Board's display of the Monument as presumptively unconstitutional because the Monument is inscribed with the Ten Commandments.

### ii. The Monument's Effect

Governments may not "mak[e] adherence to a religion relevant in any way to a person's standing in the political community." *County of Allegheny v. Am. Civil Liberties Union Greater Pittsburgh Chapter*, 492 U.S. 573, 594 (1989) (quoting *Lynch*, 465 U.S. at 687 (O'Connor, J., concurring)). And actions which have the effect of communicating governmental endorsement or disapproval, "whether intentionally or unintentionally, . . . make religion relevant, in reality or public perception, to status in the political community." *Lynch*, 465 U.S. at 692 (O'Connor, J., concurring). In applying the effect prong, we "evaluate whether a reasonable observer, aware of the history and context of the community in which the conduct occurs, would view the practice as communicating a message of government endorsement or disapproval." *Bauchman*, 132 F.3d at 551-52 (internal quotation marks omitted). "However, not every governmental activity that confers a remote, incidental or indirect benefit upon religion is constitutionally invalid." *Id.* at 555. Rather, it must be established that the

---

[9](...continued)
object is unmistakable" when "the government initiates an effort to place this statement alone in public view." 545 U.S. at 869. Because this case involves neither government initiation nor an isolated display, we are on firm footing in reviewing this case without adopting a presumption against the Monument.

governmental activity has "a *princip[al]* or *primary* effect of advancing or endorsing religion." *Id.*

In *Weinbaum*, we noted that application of the effect prong of the *Lemon* test to a particular set of facts "involves an objective inquiry." *See Weinbaum*, 541 F.3d at 1031; *cf. Borden v. Sch. Dist. of Twp. of E. Brunswick*, 523 F.3d 153, 175 (3d Cir. 2008) (viewing the endorsement analysis as constituting a distinct Establishment Clause test but noting that "[t]he test does not focus on the government's subjective purpose when behaving in a particular manner, but instead focuses on the perceptions of the reasonable observer"), *cert. denied*, 129 S. Ct. 1524 (2009). We proceeded then to offer a useful summary of the nature of the inquiry:

> [T]he "effect" prong looks through the eyes of an objective observer who is aware of the purpose, context, and history of the symbol. The objective or reasonable observer is kin to the fictitious "reasonably prudent person" of tort law. So we presume that the court-created "objective observer" is aware of information "not limited to the information gleaned simply from viewing the challenged display." If a government symbol has long gone unchallenged, there is a suggestion that an objective observer would not think that the symbol endorses a religious message.

*Weinbaum*, 541 F.3d at 1031 (citations and footnote omitted) (quoting *Gaylor v. United States*, 74 F.3d 214, 217 (10th Cir. 1996); *O'Connor*, 416 F.3d at 1228).

In this inquiry, "[u]ndoubtedly, the 'objective observer' is presumed to know far more than most actual members of a given community." *Id.* at 1031

- 28 -

n.16. "[R]easonable observers have reasonable memories" and are aware of "the context in which the policy arose." *McCreary*, 545 U.S. at 866 (alteration and internal quotation marks omitted). However, we do not treat the reasonable observer as omniscient. *See, e.g.*, *Bauchman*, 132 F.3d at 560 (concluding that courts "impart[] such knowledge to the reasonable observer in the broad sense of community awareness, not in the sense that a reasonable observer would have knowledge of every alleged past constitutional violation of a particular defendant").

Consistent with the fact-intensive nature of this effect inquiry, "the Supreme Court has advised that, in Establishment Clause cases, 'the inquiry calls for line drawing; no fixed, *per se* rule can be framed.'" *Weinbaum*, 541 F.3d at 1039 (quoting *Lynch*, 465 U.S. at 678)). A challenged government action that might pass constitutional muster in some settings might be deemed "constitutionally suspect in some other American communities or in other contexts." *Id.*; *cf. Borden*, 523 F.3d at 158-59, 178 (holding that "when viewing the acts [i.e., "silent acts of bowing his head during his team's pre-meal grace and taking a knee with his team during a locker-room prayer"] in light of [plaintiff coach's] twenty-three years of prior prayer activities with the East Brunswick High School football team during which he organized, participated in, and even led prayer activities with his team, a reasonable observer would conclude that [plaintiff] was endorsing religion when he engaged in these acts," but noting that

- 29 -

"this conclusion would not be so clear" without these "twenty-three years of prior prayer activities"). "Context carries much weight in the Establishment Clause calculus." *Weinbaum*, 541 F.3d at 1033.

Thus, the reasonable observer in this case would be aware of the nature and history of the Haskell County community, the circumstances surrounding the Monument's placement on the courthouse lawn, its precise location on the lawn and its spatial relationship to the other courthouse monuments, and also the Haskell County community's response to the Monument. In particular, the reasonable observer would be aware of Mr. Bush's religious motivation for seeking the erection of the Monument. After learning of these motivations, the Board swiftly approved its erection and allowed the project to go forward, despite being aware that there might be adverse legal consequences.[10]  And, when those

---

[10]  To be clear, the focus is on the government actor's conduct rather than the private citizen's. In connection with *Lemon*'s purpose prong, this is probably most patent. *See Weinbaum*, 541 F.3d at 1031 ("[W]e must scrutinize the *government's* intent; thus, where the challenged conduct is the selection or display of artwork, the artist's inspiration or intent is irrelevant."); *Summum v. City of Ogden*, 297 F.3d 995, 1010 (10th Cir. 2002) ("The purpose inquiry, however, centers not on the purpose animating the speech of a particular private actor . . . but, rather, on the purpose for which the *government* allows such speech on government property."); *cf. Borden*, 523 F.3d at 175 (noting that "[t]he [endorsement] test does not focus on the government's subjective purpose when behaving in a particular manner, but instead focuses on the perceptions of the reasonable observer"). Therefore, the subjective motivation of Mr. Bush per se, in the purpose inquiry, is essentially irrelevant. However, as to the effect prong, things are not that simple. Under the effect prong, although the area of concern is still the government actor's conduct—that is, its effect—the analysis must undertake a significant inquiry into the surrounding circumstances of which the

(continued...)

adverse legal consequences did in fact materialize in the form of Mr. Green's lawsuit, the Board seemingly did not hesitate to stay the course, electing to maintain the Monument without clarifying its purposes in doing so. Further, although the Monument ultimately also was inscribed with the Mayflower Compact, the Board approved the Monument with the understanding that it would be inscribed only with the Ten Commandments.

Haskell County is a place where "[e]veryone knows each other." *Green*, 450 F. Supp. 2d at 1274. The Board members were identifiable as Board members. Indeed, one commissioner noted that Board members act as county officials "24 hours a day, 7 days a week." App. at 535. Mr. Bush also testified that everyone would know the commissioners and they would not have to be

---

[10](...continued)
reasonable observer would have been aware. And, here, the reasonable observer would have been aware of the circumstances under which the Monument came to sit on the courthouse lawn, including the fact that Mr. Bush revealed to the Board his unalloyed religious motivation in seeking to put the Monument there and that the Board in short order agreed to allow him to erect it. The reasonable observer would be very unlikely in the effect analysis to give the Board's agreement determinative weight as an endorsement of religion. However, in light of Mr. Bush's expressed views, the reasonable observer could not negate this circumstance as one in the totality of circumstances that was consistent with a conclusion that the Board's conduct had the effect of endorsing religion. This is something that the reasonable observer would have been more readily able to do if Mr. Bush, for example, had voiced a historical or other secular purpose for the installation of the Monument. *Cf. Van Orden*, 545 U.S. at 701 (Breyer, J., concurring) (noting that, given the Fraternal Order of Eagles's civic-education purposes aimed at fighting juvenile delinquency, "[t]he circumstances surrounding the display's placement on the capitol grounds," *inter alia*, "suggest that the State itself intended the latter, nonreligious aspects [of the Ten Commandments] tablets' message to predominate").

identified for people to know their position.

The reasonable observer would know that two of the three commissioners attended the unveiling of the Monument, which had been organized by Mr. Bush and included remarks by local pastors. *See Green*, 450 F. Supp. 2d at 1291 n.30 ("[E]veryone knows each other[,] and word travels in Haskell County faster than the constant airspeed of a European swallow."). Mr. Bush specifically recalled both of the commissioners speaking at the unveiling. Those commissioners posed for photographs beside the Monument, which appeared in locally distributed newspapers. After this lawsuit began, Mr. Bush organized a religiously themed rally to support the Monument, which gathered a crowd of three to four hundred people. The same two commissioners attended. One of them spoke briefly in support of the monument, and he is reported to have said, "I'll stand up in front of that monument and if you bring a bulldozer up here you'll have to push me down with it." App. at 1405, 1186; *see also Green*, 450 F. Supp. 2d at 1280.

Numerous quotes from these commissioners appear in news reports, ranging from statements reflecting their determination to keep the Monument, *see* App. at 459 ("I won't say that we won't take it down, but it will be after the fight."), to statements of religious belief, *see, e.g.*, App. at 455 ("That's what we're trying to live by, that right there." "The good Lord died for me. I can stand for him. And I'm going to." "I'm a Christian and I believe in this. I think it's a benefit to the community."); App. at 458-59 ("God died for me and you, and

I'm going to stand up for him."). We conclude, in the unique factual setting of a small community like Haskell County, that the reasonable observer would find that these facts tended to strongly reflect a government endorsement of religion. In particular, we find support for this conclusion in the public statements of the Haskell County commissioners. In none of their statements did the commissioners attempt to distinguish between the Board's position and their own beliefs. Several of the commissioners' statements would naturally be construed as having been made on behalf of the Board, including, "I won't say that *we* won't take it down, but it will be after the fight," App. at 459 (emphasis added), and "*We're* definitely going to leave our monument there until the law tells *us* to take it down." App. at 1170 (emphasis added). By not distinguishing their personal opinions from their official views, the commissioners left the impression that a principal or primary reason for the erection and maintenance of the display was religious. *See, e.g.*, App. at 458-59 (where one commissioner's statement that "God died for me and you, and I'm going to stand up for him" appeared in close proximity to the statement "I won't say that we won't take it down, but it will be after the fight").

Nor did the Board "act[] affirmatively to discourage any mistaken impression that private speakers [were] speaking for the Board." *Peck v. Upshur County Bd. of Educ.*, 155 F.3d 274, 281 (4th Cir. 1998). Such action or inaction has been found significant in the Establishment Clause context. *Cf. Rosenberger*

- 33 -

*v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 841 (1995) (holding that government neutrality was apparent where "the government ha[d] not fostered or encouraged any mistaken impression that" the private speech was the university's own (internal quotation marks omitted)); *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 766 (1995) (rejecting the idea that the distinction between private and government speech "disappears when the private speech is conducted too close to the symbols of government," "at least where, as here, the government has not fostered or encouraged the mistake"); *Bd. of Educ. v. Mergens ex rel. Mergens*, 496 U.S. 226, 251 (1990) (rejecting the "fear of a mistaken inference of endorsement" because the school had the capacity to make clear that "its recognition of [a student religious] club is not an endorsement of the view of the club's participants" and to the extent that it did so, "students will reasonably understand that the school's official recognition of the club evinces neutrality toward, rather than endorsement of, religious speech"). Furthermore, the photographs of commissioners standing beside the Monument—at least one depicting all three commissioners—give the impression of the Board's united endorsement of the Monument itself. Indeed, at least two of the commissioners expressly recognized that they were asked by the media to participate in the photographs because of their status as commissioners.

Like the Eighth Circuit, we "do not believe elected government officials are required to check at the door whatever religious background (or lack of it) they

carry with them before they act on rules that are otherwise unobjectionable under the controlling *Lemon* standards." *Clayton ex rel. Clayton v. Place*, 884 F.2d 376, 380 (8th Cir. 1989) (refusing to find an action unconstitutional "due only to its harmony with the religious preferences of constituents or with the personal preferences of the officials taking action"); *cf. Van Orden*, 545 U.S. at 699 (Breyer, J., concurring) ("[T]he Establishment Clause does not compel the government to purge from the public sphere all that in any way partakes of the religious. Such absolutism is . . . inconsistent with our national traditions . . . ." (citations omitted)). In a small community like Haskell County, where everyone knows everyone, and the commissioners were readily identifiable as such, however, we conclude that the reasonable observer would have been left with the clear impression—not counteracted by the individual commissioners or the Board collectively—that the commissioners were speaking on behalf of the government and the government was endorsing the religious message of the Monument. *See McCreary*, 545 U.S. at 869 ("The reasonable observer could only think that the [government] meant to emphasize and celebrate the Commandments' religious message.").[11]

---

[11] We recognize that the district court had a different take on the situation.

> No believable evidence exists that the Commissioners were ever referred to in their official capacities. Furthermore, given the nature of the humble tight-knit community in this rural

(continued...)

We underscore that the reasonable observer's impression of government endorsement would not be based upon the commissioners' statements alone. The statements would be just part of the history and context of which the reasonable observer would be cognizant. In particular, that observer also would know of the

[11](...continued)
Oklahoma county described by witnesses at trial, the court is not convinced that a reasonable observer would have viewed these men as speaking or appearing for Haskell County government.

*Green*, 450 F. Supp. 2d at 1293. However, we simply do not find the court's reasoning to be persuasive. Precisely because Haskell County is "a small, sparsely-populated, rural Oklahoma county," *id.*, no one would need to refer to the commissioners as acting in their official capacity in order for the reasonable observer to conclude that they were doing so. Furthermore, the court's assertion that it was "not convinced" from the witnesses' testimony about Haskell County's characteristics that a reasonable observer would have deemed the commissioners to be acting for the county is not the sort of finding concerning "the basic historical facts upon which the claim is grounded" that is afforded "the usual 'clearly erroneous' standard of review." *Friday*, 525 F.3d at 950; *cf. Green*, 450 F. Supp. 2d at 1284, 1293 (making this specific assertion appearing in portion of opinion entitled "Conclusions of Law"). The question is not whether the commissioners actually were carrying out official functions in connection with their appearances at the Monument and in offering comments about it. *Cf. Green*, 450 F. Supp. 2d at 1276 (finding relative to the unveiling that "neither gentlemen appeared in his official capacity as County Commissioner"); *id.* at 1280 (finding as to the rally that "there is no indication they attended in their official capacity as County Commissioners"). Rather, the question is whether a reasonable observer would have perceived them as being engaged in official activities. And the answer to that question is closely (if not inextricably) intertwined with the legal effect determination. Therefore, insofar as it is a factual finding at all, the court's assertion regarding the reasonable observer's perception is akin to a finding concerning a constitutional fact and subject to de novo review. *See Weinbaum*, 541 F.3d at 1029 (noting that in the First Amendment context we review de novo a district court's findings concerning constitutional facts). Under that standard, we conclude that the district court's assertion is not well-grounded.

religious motivation—seemingly endorsed by the Board—that led to the

installation of the Monument. And the observer would have little information

indicating that there was more at play in the Monument's installation, and the

Board members' efforts to maintain it in the face of clearly voiced Establishment

Clause concerns,[12] than the Board's desire to facilitate the dissemination of a

religious (i.e., in their view, Christian) message. In this light, we would be hard-

---

[12] There of course is no requirement that governments fold under litigation pressure or explain themselves when confronted with an Establishment Clause challenge. Indeed, we observed as much in *O'Connor*, 416 F.3d at 1227 ("A defendant's failure to change its behavior in accordance with plaintiffs' demands, however, is not in itself proof of anti-religious intent."). However, significantly, the *O'Connor* court took note under *Lemon* of the university's publicly announced secular reasons for continuing to maintain the allegedly anti-Catholic display after Establishment Clause concerns were raised. *Id.* at 1228. In particular, just because a government is not *required* to explain its intent in erecting and retaining a Ten Commandments display, in the face of strongly voiced religious endorsement allegations, does not mean that the reasonable observer is prohibited from considering the government's decision to stand mute, and from drawing inferences from that decision that the law ordinarily permits to be drawn when one does not rebut a serious allegation of wrongdoing, despite understanding it and being well situated to respond—that is, the inference that the government accepts the truth of the allegation. *Cf.* Fed. R. Evid. 801(d)(2)(B) (discussing adoptive admissions: "a statement of which the party has manifested an adoption or belief in its truth"); 5 Joseph M. McLaughlin et al., *Weinstein's Federal Evidence* (2d ed. 2009) (noting that "[a] party can adopt another's statement by responding to it with silence," and that courts must look to the circumstances including whether the party "understand[s] the statement" and is able or "unable . . . to reply to it"); *see also New Eng. Mut. Life Ins. Co. v. Anderson*, 888 F.2d 646, 650 (10th Cir. 1989) (declining to apply the adoptive admission principle to defendant because, *inter alia*, "New England did not establish that she had ever read the *Times* article [including the alleged statement], or that she was in any position to respond to the article"). That inference would not be determinative by any means, but it would be one factor, among many others, that the reasonable observer could consider in reaching a conclusion on the endorsement issue.

pressed to conclude that "a reasonable observer, reasonably informed as to the

relevant circumstances, would perceive the government to be acting neutrally."[13]

*City of Ogden*, 297 F.3d at 1010.

We recognize that certain evidence weighs against a finding of

endorsement. However, surveying the entire record, we cannot conclude that this

evidence sufficiently blunts the message of endorsement that we find to be

present to alter the result. Perhaps militating most significantly in favor of a

conclusion of non-endorsement is the fact that a reasonable observer would have

---

[13] The Board can draw little (if any) support from the fact that Mr. Bush raised the funds for the Monument from private sources and effectively donated it to Haskell County for placement on the courthouse lawn. *See Green*, 450 F. Supp. 2d at 1295-96 (treating the "unexpected dispute" over whether Haskell County actually owns the Monument as essentially waived). The Supreme Court's *Pleasant Grove* decision dispels any doubt—at least under these facts—that, once donated, the Monument manifested government speech as a matter of law. *Pleasant Grove*, 129 S. Ct. at 1132 (holding that "[p]ermanent monuments displayed on public property typically represent government speech"); *see supra* note 8. Furthermore, even before *Pleasant Grove*, Establishment Clause jurisprudence made clear that, standing alone, the fact that a display is privately donated cannot insulate the government actor from a meaningful constitutional challenge; indeed, Establishment Clause cases not uncommonly have involved donated displays. *See, e.g.*, *Van Orden*, 545 U.S. at 701 (Breyer, J., concurring) ("The group that donated the monument, the Fraternal Order of Eagles, a private civic (and primarily secular) organization, while interested in the religious aspect of the Ten Commandments, sought to highlight the Commandments' role in shaping civic morality as part of that organization's efforts to combat juvenile delinquency."); *Card v. City of Everett*, 520 F.3d 1009, 1010 (9th Cir. 2008) (noting in an Establishment Clause case that the monument was "donated to the City of Everett . . . by the local aerie (chapter) of the Fraternal Order of Eagles"); *cf. City of Ogden*, 297 F.3d at 998, 1009 (undertaking Establishment Clause hypothetical analysis when raised as a "defense" in lawsuit involving Ten Commandments monument donated by the Fraternal Order of Eagles).

noticed that the Monument was one of numerous other monuments and displays on the courthouse lawn. This fact would typically weigh against a finding of endorsement. *See O'Connor*, 416 F.3d at 1228 ("The reasonable observer . . . would therefore be aware that the statue was one of thirty outdoor sculptures displayed on the Washburn campus, of which several were located within sight of the challenged display."); *City of Ogden*, 297 F.3d at 1011 ("[W]e are persuaded that a reasonable observer would, instead, note the fact that the lawn of the municipal building contains a diverse array of monuments, some from a secular and some from a sectarian perspective."); *see also Van Orden*, 545 U.S. at 701 (Breyer, J., concurring) ("[T]o determine the message that the text [of the Ten Commandments] here conveys, we must examine how the text is *used*. And that inquiry requires us to consider the context of the display."); *O'Connor*, 416 F.3d at 1228 ("[T]he question of whether the government has endorsed a particular religious display depends in large part on the display's particular physical setting."). In this regard, in finding that the Monument was constitutional, the district court opined that the "mélange" on the courthouse lawn represents "what Haskell County citizens consider the noteworthy events and sentiments of their county, their state and their nation." *Green*, 450 F. Supp. 2d at 1295.[14]

---

[14] We do not think the reasonable observer would find the Monument's precise location militates in favor of a conclusion of impermissible endorsement. Mr. Green would have us place significance on the fact that the Monument could be viewed from the road. While we have noted in the past that a prominent

(continued...)

- 39 -

However, the Monument is not a part of a unified exhibit in a "typical museum setting" like the statute found in *O'Connor*. *See O'Connor*, 416 F.3d at 1228 (noting that a brochure made clear "that the statue was part of an outdoor art exhibit"). Nor is the courthouse lawn a setting that is typically associated with intellectual experimentation like the university setting of *O'Connor*. *Id.* at 1229-30 (noting that the statue at issue, *Holier Than Thou*, was "displayed in the context of a university campus, a place that is peculiarly the marketplace of ideas" and that "especially" in that context "no reasonable person would associate the message of *Holier Than Thou* with the state" (internal quotation marks omitted)). Furthermore, we do not view the Haskell County courthouse context as bearing a close resemblance to the monument setting in *Van Orden*. 545 U.S. at 702 (Breyer, J., concurring) (describing the monument sitting "in a large park containing 17 monuments and 21 historical markers, all designed to illustrate the

---

[14](...continued)
location can weigh in favor of endorsement, *see O'Connor*, 416 F.3d at 1228 (observing that factors including "the statue's location next to a footpath at a prominent location on campus, in an area reserved for official use" would "weigh toward a finding of state endorsement"), this Monument was placed in line with the other monuments already on the lawn, and the monuments could all be seen together. *See* Appendix Ex. C. Thus, we see no grounds for concluding that a reasonable observer would find that the Board had assigned a place of special prominence to the Monument in an effort to endorse its religious message. *See Green*, 450 F. Supp. 2d at 1294 ("[T]he Monument is not particularly large, and is not in a clearly high traffic area. . . . Furthermore, the Monument does not appear to be placed in an area that is the most frequented route taken to the courthouse by citizens going there to undertake business."). However, as suggested by the analysis relating to *O'Connor* and *Van Orden* in text *infra*, this point hardly wins the day for the Board.

'ideals' of those who settled in Texas and of those who lived there since that time").[15] Although ultimately finding that the Monument had a secular effect, the district court here acknowledged that "people . . . might see the monument display [of *Van Orden*] in Texas as more cohesive, more integrated, more, well, artistic than the Stigler mélange."[16] *Green*, 450 F. Supp. 2d at 1288.

---

[15] To be sure, at a high level of generality, the Haskell County courthouse display involving the Monument does bear some similarities to the capitol grounds display in *Van Orden*. However, one might reasonably expect that frequently that will be the case with Ten Commandments monument displays on courthouse lawns, or capitol grounds, or similar governmental venues. Even before *Van Orden*, governments undoubtedly were inclined to display in such places multiple symbols of things that they presumed the people they served cherished or venerated, including the Ten Commandments. *E.g.*, *City of Ogden*, 297 F.3d at 998 ("Located to the left and to the right of the Monument are, respectively, a police officer memorial and a sister city tree and plaque. Also located on the Municipal Grounds, though somewhat removed from the area containing the above-described monuments, are various historical markers."). After *Van Orden*, governments wishing to display Ten Commandments monuments will be even more motivated to display them with multiple symbols in the hope of gaining some incremental level of protection against Establishment Clause liability.

[16] Lest we generate confusion, this is not a matter of aesthetics. In *Van Orden*, the secular historical and moral messages of the Ten Commandments display were highlighted by the fact that they were part of an assortment of monuments that shared a unifying, cohesive secular theme. *Van Orden*, 545 U.S. at 701-02 (Breyer, J., concurring). That theme reflected "the historical 'ideals' of Texans" that allegedly were grounded on moral principles involving ethics and the law. *Id.* at 702. Therefore, at least in part due to the cohesive theme, the capitol grounds display in *Van Orden* "communicate[d] to visitors" predominately the message that "the State sought to reflect moral principles, illustrating a relation between ethics and law," *id.*—rather than a message that was predominately religious. The district court here apparently recognized this aspect of *Van Orden*. That led the court to observe that, although there were several monuments on Haskell County's courthouse lawn, there was less of a unifying,

(continued...)

Significantly, the sharp contrast between the timing of the legal challenges

to the monument in *Van Orden* and the one in this case sheds significant light on

whether the reasonable observer would have perceived the latter as having the

effect of endorsing religion. *See Weinbaum*, 541 F.3d at 1031 ("If a government

symbol has long gone unchallenged, there is a suggestion that an objective

observer would not think that the symbol endorses a religious message."). In *Van

Orden*, Justice Breyer observed that "40 years passed in which the presence of

this monument, legally speaking, went unchallenged." 545 U.S. at 702 (Breyer,

J., concurring); *see id.* at 682 (plurality opinion) ("Forty years after the

monument's erection and six years after Van Orden began to encounter the

monument frequently, he sued numerous state officials in their official capacities

. . . seeking both a declaration that the monument's placement violates the

Establishment Clause and an injunction requiring its removal.").

Justice Breyer reasoned that those years of tranquility "suggest more

strongly than can any set of formulaic tests that few individuals, whatever their

system of beliefs, are likely to have understood the monument as amounting, in

---

[16](...continued)
cohesive secular theme associated with those monuments than with the *Van Orden*
monuments. As a consequence, under the reasoning of *Van Orden*, the Haskell
County courthouse display was at least to some appreciable degree less likely
than the *Van Orden* display to bring to the fore the secular historical and moral
messages of the Ten Commandments. The reasonable observer therefore would
be more inclined than in *Van Orden* to view the Ten Commandments as evincing
a religious message. Therefore, the point here is not one of aesthetics.

any significantly detrimental way, to a government effort to favor a particular religious sect, primarily to promote religion over nonreligion." *Id.* at 702 (Breyer, J., concurring); *cf. id.* at 703 ("This case also differs from *McCreary County*, where the short (and stormy) history of the courthouse Commandments' displays demonstrates the substantially religious objectives of those who mounted them, and the effect of this readily apparent objective upon those who view them."). Indeed, Justice Breyer found the passage of forty years without a challenge to the monument to be "determinative."[17] *Id.* at 702; *cf. Pleasant Grove*, 129 S. Ct. at 1140 (Scalia, J., concurring) (noting that "[t]he city can safely exhale" and its residents can enjoy a public park containing a Ten Commandments monument "without fear that they are complicit in an establishment of religion," because, *inter alia*, the monument "was erected in 1971" and that "means it is approaching its (momentous!) 40th anniversary" without an Establishment Clause challenge).

Here, the difference is striking. In less than one year after the Monument

---

[17] Given that *Van Orden* was decided by a plurality, the separate opinion of Justice Breyer, who supplied the "decisive fifth vote," *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1198 (10th Cir. 2003), is controlling under the rule of *Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." (internal quotation marks omitted)). *See* Clement, *Public Displays*, *supra*, at 241 ("Because no opinion [in *Van Orden*] commanded a majority, Justice Breyer's concurring opinion is the law of the case.").

was unveiled, Mr. Green challenged the erection of the Monument as an Establishment Clause violation, filing the federal lawsuit underlying this appeal. Accordingly, despite its presence on the courthouse lawn with other displays and monuments, this rather prompt litigation response to the Monument makes it difficult for us to glean "a suggestion that an objective observer would not think that the symbol endorses a religious message." *Weinbaum*, 541 F.3d at 1031. Accordingly, viewing the record as a whole, we do not believe that the Monument's setting here should lead us to a different conclusion on the endorsement question.

Likewise, we cannot conclude that the Monument's text that is unrelated to the Ten Commandments would persuade a reasonable observer that the principal or primary effect was not to endorse religion. The reasonable observer would have been aware that the Monument not only contained the Ten Commandments, but also the Mayflower Compact. The fact that the Ten Commandments are not displayed in isolation is not without significance. *See, e.g.*, *McCreary*, 545 U.S. at 869 ("The point is simply that the original text [of the Ten Commandments] viewed in its entirety is an unmistakably religious statement dealing with religious obligations and with morality subject to religious sanction. When the government initiates an effort to place this statement *alone* in public view, a religious object is unmistakable." (emphasis added)). But, at least on these facts, the import of its pairing with the Mayflower Compact is equivocal at best.

The Mayflower Compact has an independent historical significance and also demonstrates the relevance of religion to that history. *See, e.g.*, *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 213 (1963) ("The fact that the Founding Fathers believed devotedly that there was a God and that the unalienable rights of man were rooted in Him is clearly evidenced in their writings, from the Mayflower Compact to the Constitution itself."); *see also Van Orden*, 545 U.S. at 683 (quoting same); *Edwards v. Aguillard*, 482 U.S. 578, 606 (1987) (Powell, J., concurring) (quoting same). However, we cannot construe a display of the Ten Commandments not to be an endorsement of religion merely because it is accompanied by the Mayflower Compact or other secular documents. *See McCreary*, 545 U.S. at 854, 856 (noting that the Mayflower Compact was included in the second and third versions of the display containing the Ten Commandments that was ultimately struck down). Its inclusion arguably could be viewed as merely part of an "unstinting focus . . . on religious passages" that merely furthers the endorsement. *Id.* at 870. The evidence thus cuts in both directions, and because no effort was made by the Board to help the reader interpret the intended relationship between the two documents, the reasonable observer would not find the Mayflower Compact helpful in determining whether the Monument endorses religion.[18]

_____

[18]    Furthermore, we also note that the reasonable observer would have been aware that the Mayflower Compact was added by Mr. Bush *after* the Board
(continued...)

- 45 -

Similarly, we do not believe that the reasonable observer would be less inclined to find an impermissible endorsement of religion because of the Monument's notation "Erected by Citizens of Haskell County." We recently suggested in other cases that a city could post a disclaimer "explaining clearly that private entities are responsible for at least some of the [monuments on municipal grounds], including the Ten Commandments Monument and the Seven Principles Monument." *City of Ogden*, 297 F.3d at 1011; *see Van Orden*, 545 U.S. at 701-02 (Breyer, J., concurring) ("The tablets, as displayed on the monument [bearing the Ten Commandments], prominently acknowledge that the Eagles [a private civic, and primarily secular, group] donated the display, a factor

[18](...continued)
authorized the Monument project and the Board apparently did not subsequently formally agree to its placement on the Monument. This fact may bear more on the purpose inquiry. *Cf. O'Connor*, 416 F.3d at 1226 ("Nor does the evidence show that the statue's caption was selected with anti-Catholic intent. The record establishes that the caption had not yet been placed on the statue at the time it was selected by the Campus Beautification Committee and approved by President Farley."). However, the Monument's context and history certainly also are relevant to the effect inquiry. *See, e.g.*, *Weinbaum*, 541 F.3d at 1031 (noting that the effect prong "looks through the eyes of an objective observer who is aware of the purpose, *context*, *and history* of the symbol" (emphasis added)); *cf. O'Connor*, 416 F.3d at 1225 n.2 ("In this case, the context and content of the statue is relevant to the effect of the display in addition to the university's purpose.") Therefore, the reasonable observer assessing the Monument's effect would have been aware that at the time the Board authorized its erection, as far as the Board knew, the Monument would consist only of the Ten Commandments. *Cf. Weinbaum*, 541 F.3d at 1033 ("Effects are most often the manifestations of a motivating purpose."). Consequently, even if the independent historical significance of the Mayflower Compact ordinarily would militate in favor of a finding of non-endorsement in the reasonable observer's eyes, the reasonable observer probably would have been less likely to give it that effect here.

which, though not sufficient, thereby further distances the State itself from the religious aspect of the Commandments' message."). However, the addition of such a disclaimer would not be "sufficient," alone, *Van Orden*, 545 U.S. at 701 (Breyer, J., concurring), and could not tip the balance on these facts, given the very significant magnitude of the evidence indicating an impermissible endorsement.[19] Furthermore, any incremental movement toward the side of non-endorsement resulting from the addition of the notation would be hobbled by the reasonable observer's awareness that the addition took place *after* litigation had begun and on the eve of trial. Litigation positions do not alter reasonable memories. *Cf. McCreary*, 545 U.S. at 871-72 (noting that the counties' "new statements of purpose were presented only as a litigating position" and that "[n]o reasonable observer could swallow the claim that the Counties had cast off the [religious] objective so unmistakable in earlier displays").

We conclude by underscoring the proposition that "[c]ontext carries much weight in the Establishment Clause calculus." *Weinbaum*, 541 F.3d at 1033. In the context of the small community of Haskell County, we hold that the Board's

---

[19] Indeed, we had no occasion in *City of Ogden* to assess the likely impact of such a disclaimer because it would merely have aided there in confirming what already was clearly not an Establishment Clause violation. *See City of Ogden*, 297 F.3d at 1011 (rejecting the argument that, hypothetically, the city's acceptance of a display with a religious theme would have the effect of endorsing religion, but noting "[t]o the extent to which the City of Ogden remains genuinely concerned regarding the likely *misapprehensions* of passersby, the City might also post a disclaimer" (emphasis added)).

actions in authorizing and maintaining the Monument—inscribed with the Ten Commandments—on the courthouse lawn had the impermissible principal or primary effect of endorsing religion in violation of the Establishment Clause.

### III.  CONCLUSION

The district court's order is **REVERSED**.  We **REMAND** for the district court to enter judgment consistent with this opinion.

# Appendix A



Plaintiffs' Exhibit 85 (size reduced to fit page).

## Appendix B



Defendants' Exhibit 7 (Deposition Exhibit 6) (size reduced to fit page).

**Appendix C**



Defendants' Exhibit 27 (size reduced to fit page).

## Appendix D



CIV-05-406 WH
Plaintiffs' Exhibit 1

App. 1386

Plaintiffs' Exhibit 1 (size reduced to fit page).