Jane FELIX; B.N. Coone,
Plaintiffs–Appellees,

v.

CITY OF BLOOMFIELD,
Defendant–Appellant.

Liberty Counsel, Amicus Curiae.

No. 14-2149

United States Court of Appeals,
Tenth Circuit.

Filed November 9, 2016

Jonathan A. Scruggs, Alliance Defending Freedom, Scottsdale, Arizona (David A. Cortman and Kevin H. Theriot, Alliance Defending Freedom, Scottsdale, Arizona, Joel Oster, Oster Law Firm, Shawnee, Kansas, and Ryan Lane, T. Ryan Lane, P.C., Aztec, New Mexico, with him on the briefs), for Defendant–Appellant.

Andrew G. Schultz, Rodey Dickason Sloan Akin & Robb, P.A., Albuquerque, New Mexico (Matthew M. Beck, Rodey Dickason Sloan Akin & Robb, P.A., Albuquerque, New Mexico, Alexandra Freedman Smith, ACLU of New Mexico Foundation, Albuquerque, New Mexico with him on the briefs), for Plaintiffs–Appellees.

Mathew D. Staver, Anita L. Staver, and Horatio G. Mihet, Liberty Counsel, Orlando, Florida, and Mary E. McAlister, Liberty Counsel, Lynchburg, Virginia, filed a brief for Amicus Curiae.

Before BACHARACH, EBEL, and McHUGH, Circuit Judges.

EBEL, Circuit Judge.

The Ten Commandments are a symbol of both religious and secular significance. McCreary Cty. v. ACLU of Ky., 545 U.S. 844, 869, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005) ("[T]he original text viewed in its entirety is an unmistakably religious statement dealing with religious obligations and with morality subject to religious sanction."); Van Orden v. Perry, 545 U.S. 677, 701, 125 S.Ct. 2854, 162 L.Ed.2d 607 (2005) (Breyer, J., concurring in the judgment) (noting the Ten Commandments can convey "a secular moral message ... about proper standards of social conduct" or a message "about a historic relation between those standards and the law"); id. at 690, 125 S.Ct. 2854 (plurality opinion) ("Moses was a lawgiver as well as a religious leader."). Because of this duality, there are some circumstances in which the government's display of the Ten Commandments runs afoul of the Establishment Clause, and other times when the display passes constitutional muster. The outcome depends principally on the degree to which the government's conduct, as perceived by an objective observer, amounts to a religious endorsement either in purpose or effect. Green v. Haskell Cty. Bd. of Comm'rs, 568 F.3d 784, 796–97 (10th Cir. 2009) (applying the "Lemon test," as refined by Justice O'Connor's concurrence in Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984)).

In this case, Plaintiffs Jane Felix and B.N. Coone challenge the City of Bloomfield's conduct allowing the installation of a Ten Commandments monument on the City Hall Lawn. The lawsuit raises two preliminary questions before we proceed to the Establishment Clause analysis. We first consider standing and conclude Plaintiffs have suffered a legally sufficient injury to bring their claim in federal court. We next ask whether the monument is government speech subject to the limitations of the Establishment Clause, or instead is private speech in a public forum which enjoys immunity from First Amendment scrutiny. The Supreme Court tells us that permanent monuments are government speech, even when donated by a private actor—so we conclude the First Amendment applies here.

We finally confront the religious endorsement effect of the display. In light of the context and apparent motivation of the Ten Commandments' placement on the lawn, we conclude the City's conduct had the effect of endorsing religion in violation of the Establishment Clause. Accordingly, having jurisdiction under 28 U.S.C. § 1291, we AFFIRM.

## BACKGROUND FACTS

The City of Bloomfield is a small community located in San Juan County, in the

northwest corner of New Mexico. Bloomfield's Municipal Complex includes City Hall and City Hall Lawn, the Fire Station, a utilities department where residents pay water bills, and various other municipal departments. Plaintiffs Jane Felix and B.N. Coone are polytheistic Wiccans who reside in Bloomfield. That means they do not adhere to Christianity's conception of one deity, or subscribe to the principles and dictates advanced by the Commandments.

At an April 2007 Bloomfield City Council Meeting, City Councilor Kevin Mauzy proposed that the council allow him to install privately-funded monuments on the City Hall Lawn, in front of City Hall (an area of about thirty feet by forty-five feet). Mauzy's initial presentation to the council offered ideas ranging from the Declaration of Independence to the Code of Hammurabi, but he sought the council's immediate approval for only one: the Ten Commandments monument ("Monument"). At this point, Bloomfield did not have a policy for what kinds of monuments may be installed on the lawn. Despite objections from several people in attendance, the City Council approved placement of the Monument on the City Hall Lawn. Several people responded to Bloomfield's approval of the Monument by presenting a petition and writing letters to Bloomfield and local newspapers opposing the Monument on city property. Mauzy then contacted a local business to begin constructing the Monument and reached out to two local churches for donations to fund its construction. Two active city council members, Lynne Raner and Lamar Morin (a pastor at one of the churches), donated to the project through their respective churches.

In July 2007, three months after the City Council initially approved the Monument, the City Council approved Resolution #2007–12 ("Forum Policy No. 1"), the first forum policy governing the placement of "permanent" monuments on the lawn. The forum policy imposed two requirements relevant here: (1) a statement on all monuments "explaining that the message communicated by the monument is that of the donor, not the City of Bloomfield," and (2) that all monuments "relate to the history and heritage of the City's law and government." (Aplt. App. 288). The policy gave the City Council "absolute discretion" to reject a proposed monument based on aesthetic, safety, or practical concerns. (Id. at 289).

As donations dwindled for the Monument, Mauzy left the City Council in 2008 and abandoned efforts for the tablet's construction. In 2010, however, Mauzy revived his endeavor and began fundraising again, although this time not through churches. In the Spring of 2011, Mauzy sought to present the final plan to the City Council. He was added to the "consent agenda" for items that are routine, procedural, or had been formerly discussed. (Id. at 284). The City Council unanimously approved the Monument over an objection from a citizen in attendance, and Mauzy erected it on the lawn on July 1, 2011. It weighs over 3,400 pounds and is embedded approximately fourteen inches into the ground.

The Monument is at the front of the lawn, and its prominence depends on where a person enters the City Hall parking lot. (See App. Fig 2). It is also visible from U.S. Highway 550, one of the main roads through town. At the bottom of the tablet, a disclaimer set in small inconspicuous font reads: "Any message hereon is of the donors and not the City of Bloomfield." (Id. at 1088). The day he installed the Monument, Mauzy also placed an additional freestanding disclaimer sign on the City Hall Lawn, (see App. Fig. 3), that reads:

The City has intentionally opened up the lawn around City Hall as a public forum

where local citizens can display monuments that reflect the City's history of law and government. Any message contained on a monument does not necessarily reflect the opinions of the City, but are statements from private citizens. If you would like to display a monument in this forum, please contact the City Clerk, who can give you a copy of the ordinance that explains the procedures for displaying a monument.

(Id. at 287).

Mauzy held a dedication ceremony for the Ten Commandments on the City Hall Lawn on July 4, 2011. The occasion was replete with both secular and religious observances. The Star Spangled Banner was sung, the Pledge of Allegiance was recited, and members of the local Veterans of Foreign Wars chapter ceremoniously folded the American flag. But the event was inaugurated with prayer from a church deacon, the flag-folding was set to religious narration, and Mauzy delivered remarks emphasizing and celebrating Christian precepts. Among other comments laden with religious meaning, Mauzy said, "Some would believe this monument is a new thing. They have been so busy trying to remove God from every aspect of our lives.... God and his Ten Commandments continue to protect us from our evil." (Id. at 465). He also read the disclaimer on the bottom of the Monument out loud.

Later the same month, on July 25, 2011, the City Council approved a revised forum policy proposed by Mauzy, Resolution #2011–15 ("Forum Policy No. 2"), which removed the word "permanent" from the earlier version and required donors to reapply every ten years to keep their monuments on the lawn. About four months later, in October 2011, the council approved Mauzy's proposed Declaration of Independence monument, which he installed in November 2011. He held another dedication ceremony for that monument, but without any religious components.

After Plaintiffs filed suit on February 8, 2012, the City Council approved, and Mauzy later installed, monuments depicting the Gettysburg Address (dedicated July 4, 2012) and the Bill of Rights (dedicated July 4, 2014). Both had dedication ceremonies devoid of religious overtures. As of the time of filing, Mauzy was the only person to apply for or install monuments on the City Hall Lawn. Bloomfield had not advertised its forum policy nor sought monuments from any other citizens.

## STANDARD OF REVIEW

▬▬ We ordinarily review a district court's factual findings for clear error and its legal conclusions *de novo*. Green, 568 F.3d at 795. In First Amendment cases, however, the Court examines "constitutional facts" *de novo*. Id. When the dispute concerns an alleged Establishment Clause violation, "constitutional facts" are the "district court's findings on each part of the Lemon test." Id. at 795–96 (internal quotation marks omitted) (referring to the tripartite test from Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971)). That test has three parts—purpose, effect, and entanglement—but the district court here grounded its decision only on the "effect" prong. Accordingly, we limit our analysis to whether there was an effect of endorsement.[1]

---

1. In finding an impermissible effect of religious endorsement in this case, the district court relied partly on observations about the apparent purpose of the monument. As we explain below, that makes sense. What a reasonable observer perceives as the purpose of a religious display is relevant to whether there is an "effect"—or impression—of government endorsement. In light of the relevance of perceived purpose to the "effect" prong of the

854

## DISCUSSION

### I. Standing

 We begin with standing. Because Article III standing is a jurisdictional issue, we must satisfy ourselves that it exists here. Lujan v. Defenders of Wildlife, 504 U.S. 555, 559–60, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Plaintiffs must meet three requirements for standing: injury-in-fact, causation, and redressability. Id. at 560–61, 112 S.Ct. 2130. We are quickly satisfied the latter elements exist, so the only issue we address on appeal is injury-in-fact. "In the context of alleged Establishment Clause violations, a plaintiff may establish non-economic injury if 'directly affected by the laws and practices against which their complaints are directed.'" Green, 568 F.3d at 793 (quoting O'Connor v. Washburn Univ., 416 F.3d 1216, 1222–23 (10th Cir. 2005)).

 Bloomfield argues Plaintiffs lack standing because "being offended" is not an injury-in-fact, and Plaintiffs never actually read the text on the Monument. Bloomfield cites Town of Greece v. Galloway for the notion that offense is no longer enough for standing. —— U.S. ——, 134 S.Ct. 1811, 1826, 188 L.Ed.2d 835 (2014). But the words "standing," "jurisdiction," or "Article III" do not appear anywhere in the Galloway decision; that case only discussed the merits of an Establishment Clause claim. Id. at 1826–28. In the Tenth Circuit, we have decided multiple cases where direct contact with religious monuments on public property sufficed for standing. See, e.g., Am. Atheists, Inc. v. Davenport, 637 F.3d 1095, 1113–14 (10th Cir. 2010) (large white crosses on side of highway memorializing fallen state troop-

ers); Green, 568 F.3d at 788, 793–94 (Ten Commandments monument erected on county courthouse lawn); O'Connor, 416 F.3d at 1218–19, 1222–23 (artwork on college campus that was offensive to Catholics).

Plaintiffs have had the requisite direct contact here. The Monument sits outside the main entrance to Bloomfield City Hall, which includes the utilities department where people pay water bills. It is at the front of the City Hall Lawn, and is visible from a major road through town (U.S. 550). Both Plaintiffs are polytheistic Wiccans and testified they feel excluded by the Ten Commandments, particularly the first four commandments.[2] And while Bloomfield argues that past exposure does not create an "imminent injury," the facts found by the district court establish ongoing injuries and changes to Plaintiffs' behavior resulting from the highly visible religious display. Felix stopped going to City Hall to pay her water bills so she could avoid the Monument, but still sees it from the road five or six times a week. Coone drives past the Monument three or four times a week and sees it up-close every month when he goes to pay his water bill. That kind of exposure is more than enough for standing.

Bloomfield further argues that Plaintiffs lack standing because they have never read the text on the Monument. Merely *seeing* the Monument, Bloomfield says, is not contact that is sufficiently "frequent, direct, and imminent" for standing purposes. (Aplt. Br. 75). That proposition is supported only by inapposite case law from another federal circuit, and we de-

---

Lemon test, our analysis appropriately accounts for the apparent motivations for erecting the display.

**2.** The First Commandment on the monument reads, "Thou shalt have no other gods before me"—a particularly disconcerting command for polytheists.

cline to bind ourselves thereby.[3] Bloomfield offers no case from this Court that stands for the rule that a person must *study* an offensive monument in order to bring a claim in federal court. In fact, the injury requirement is often described as having to *"view* a religious object," not examine it scrupulously. O'Connor, 416 F.3d at 1223 (emphasis added) (internal quotations omitted). Once Plaintiffs learn the Monument is the Ten Commandments, they will know what it is whenever they view it, even from afar. Plaintiffs have therefore established the kind of contact required for Article III standing.

## II. Government speech

■ We next consider the nature of the speech. The Establishment Clause constrains government speech only. See Bd. of Educ. v. Mergens ex rel. Mergens, 496 U.S. 226, 250, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990). Because of that limitation, Bloomfield argues the Monument is permissible because it is a private person's speech existing in a public forum. But the Supreme Court has held that permanent monuments are government speech, regardless of whether a private party sponsored them. Pleasant Grove City v. Summum, 555 U.S. 460, 470–71, 129 S.Ct. 1125, 172 L.Ed.2d 853 (2009) ("Just as government-commissioned and government-financed monuments speak for the government, so do privately financed and donated monuments that the government accepts and displays to the public on government

land."); see also Davenport, 637 F.3d at 1111, 1115 ("[T]he fact that [a private non-profit organization], not Utah, owns the memorial crosses does not affect our determination of whether they are government speech.").

■ The question, therefore, is whether the Monument is permanent. The Monument is over five feet tall weighing over 3,400 pounds, with a foundation of steel, concrete, and wood embedded fourteen inches in the ground. The foundation anchors the granite tablet with steel dowels to keep the Monument upright. Moreover, Forum Policy No. 1—under which the Monument was approved, built, and dedicated—specifically used the term "permanent" three times to describe the monuments it would allow. The Supreme Court did not detail what makes a monument "permanent" when it decided Summum, but we are confident the Ten Commandments here meets the standard.

It is no answer for Bloomfield to say that, under Forum Policy No. 2, the City makes donors reapply every ten years under threat of their monuments' removal. Any monument *can* be removed with a big enough construction crew. But Bloomfield has no plans to remove the Monument and imposes no limit on how many ten-year periods will be permitted. The Monument here is like the crucifixes in American Atheists, Inc. v. Davenport, where even though a private organization reserved the right to remove the roadside crosses, they

---

**3.** The D.C. Circuit held in Chaplaincy of Full Gospel Churches v. U.S. Navy (In re Navy Chaplaincy), 534 F.3d 756, 764–65 (D.C. Cir. 2008), that "[w]hen plaintiffs are not themselves affected by a government action except through their abstract offense at the message allegedly conveyed by that action, they have not shown injury-in-fact to bring an Establishment Clause claim...." (Emphasis omitted). This case does not apply here for two reasons. First, the harm alleged here is more concrete than merely an "abstract" objection to unconstitutional conduct. Second, In re Navy Chaplaincy expressly set itself apart from "religious display" cases. Id. at 765 (qualifying that its holding applies "outside the distinct context of the religious display and prayer cases"); id. at 764 ("[W]e nonetheless find significant differences between plaintiffs' case and the religious display and prayer cases." (Citing as an example a Ten Commandments case)).

were "permanent enough to constitute government speech." 637 F.3d at 1116. As a permanent monument on government property, the Monument here is government speech subject to the limitations of the First Amendment's Establishment Clause.

## III. Establishment Clause

 The First Amendment reads, "Congress shall make no law respecting an establishment of religion[.]" U.S. Const. amend. 1. That rule also binds the state governments through the Fourteenth Amendment. See Everson v. Bd. of Educ., 330 U.S. 1, 14–15, 67 S.Ct. 504, 91 L.Ed. 711 (1947). In resolving a challenge to a Ten Commandments display, the Tenth Circuit applies the three-part test from Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), as refined by Justice O'Connor's concurrence in Lynch v. Donnelly, 465 U.S. 668, 687–94, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). See Green, 568 F.3d at 796.

In Lemon, the Supreme Court set out a tripartite framework for Establishment Clause cases. To survive constitutional scrutiny, government action "(1) must have a secular legislative purpose, (2) must have a principal or primary effect that neither advances nor inhibits religion, and (3) must not foster an excessive government entanglement with religion."[4] Green, 568 F.3d at 796 (citing Lemon, 403 U.S. at 612–13, 91 S.Ct. 2105).

 Justice O'Connor's modification, the so-called "endorsement test," applies to the first and second prongs of Lemon. Under this modification, "the government impermissibly endorses religion if its conduct has either the purpose or the effect of conveying a message that religion or a

particular religious belief is favored or preferred." Green, 568 F.3d at 796 (enumeration omitted) (internal quotation marks omitted). In this case, because the district court ultimately relied on the effect prong, we confine our analysis to the effect of Bloomfield's conduct, although, consistent with the district court's approach, an apparent governmental purpose may inform the effect-prong analysis. Particularly in light of the circumstances surrounding the original installation of the Ten Commandments monument, we find Bloomfield impermissibly gave the impression to reasonable observers that the City was endorsing religion.

 What does it mean for conduct to have the "effect" of endorsing religion? The effect of endorsement is measured from the perspective of an "objective observer who is aware of the purpose, context, and history of the symbol." Id. at 799 (quoting Weinbaum v. City of Las Cruces, 541 F.3d 1017, 1031 (10th Cir. 2008)). The "objective observer is presumed to know far more than most actual members of a given community." Id. at 800 (internal quotation marks omitted). This imaginary person would be conscious of "the circumstances surrounding the Monument's placement on the . . . lawn, its precise location on the lawn and its spatial relationship to the other . . . monuments, and also the . . . community's response to the Monument. In particular, the reasonable observer would be aware of [Bloomfield's] religious motivation for seeking the erection of the Monument." Id.

 Although we are analyzing here only the "effect" prong of the Lemon test (with the "endorsement" gloss offered by Justice O'Connor), we do not ignore purpose. Id. (grounding its conclusion on

---

4. Plaintiffs' arguments do not implicate the third prong of Lemon regarding excessive en-

tanglement. Accordingly, we do not address it.

Lemon's "effect" prong, in part, on the observation that "a reasonable observer would be aware of [the sponsor's] religious *motivation* for seeking erection of the monument" (emphasis added)); id. at 802 (noting that the government "left the impression that a principal or primary reason for the erection and maintenance of the display was religious"). In focusing on the effect of the Monument and its history, we ask, in part, how a reasonably perceived governmental purpose impacts the effect such a monument will have on a reasonable observer. See Borden v. Sch. Dist., 523 F.3d 153, 175 (3d Cir. 2008) (The endorsement test "does not focus on the government's subjective purpose when behaving in a particular manner, but instead focuses on the perceptions of the reasonable observer.") (quoted by Green, 568 F.3d at 799 (10th Cir.)); cf. McCreary Cty. v. ACLU of Ky., 545 U.S. 844, 863, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005) ("A secret motive stirs up no strife and does nothing to make outsiders of nonadherents[.]"); id. at 900–01, 125 S.Ct. 2722 (Scalia, J., dissenting) ("Because in the [McCreary majority's] view the true danger to be guarded against is that the objective observer would feel like an 'outsider' or 'not a full member of the political community,' its inquiry focuses not on the *actual purpose* of the government action, but the 'purpose *apparent* from government action.'" (second emphasis added) (internal quotation marks and alterations omitted)). That makes sense because the focus of the endorsement test is on the message objectively communicated by the government's conduct, and how that message might cause some community members to feel like outsiders. See Lynch v. Donnelly, 465 U.S. 668, 687, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring) ("Endorsement sends a message to nonadherents that they are outsiders, not full members of the political communi-

ty, and an accompanying message to adherents that they are insiders, favored members of the political community."). If an objective observer has a reasonable impression that government conduct was religiously motivated, then the official action is more likely to have the "effect" of sending a message that nonadherents are "outsiders, not full members of the political community." Id. Accordingly, a government's motivation—as perceived by an objective observer—is relevant to whether the action had an effect of endorsing religion.

■ With that understanding, we now examine Bloomfield's conduct, as it would be perceived by an objective observer who is aware of the apparent purpose and specific context of the Ten Commandments display.

## A. Circumstances Manifesting Endorsement

The apparent purpose and context of the Monument's installation would give an objective observer the impression of official religious endorsement. In arriving at this conclusion, we examine the text of the Monument, its placement on the lawn, the circumstances of its financing and installation, and the timing of this litigation.

### 1. The text of the Ten Commandments is unmistakably religious

We begin with the text. The language on the granite tablet—taken from the King James Version of the Bible—unquestionably has the effect of excluding the belief systems of nonadherents. See McCreary Cty., 545 U.S. at 851, 869, 125 S.Ct. 2722 (describing the "unmistakably religious statement" conveyed by the King James Version of the Ten Commandments). Plaintiffs are a case in point. As polytheistic Wiccans, they believe in more than one

deity. The first Commandment, however, admonishes the reader that "Thou shalt have no other gods before me." (See App. Fig. 1). It is hard to imagine a religious statement that is more likely to give Plaintiffs the impression they do not belong.[5]

## 2. The location of the Monument suggests endorsement

We also find the Monument's location problematic. It resides directly in front of Bloomfield's principal government building. Moreover, it is not hidden or obscured by other monuments and it is clearly visible to any onlooker standing directly in front of the lawn—or even driving by on the highway. Cf. Cty. of Allegheny v. ACLU Greater Pittsburgh Chapter, 492 U.S. 573, 599, 601–02, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (finding an Establishment Clause violation when the County set up a nativity scene on "the Grand Staircase, the 'main' and 'most beautiful part' of the building that is the seat of county government") (abrogated on other grounds by Galloway, 134 S.Ct. at 1821). Here the Ten Commandments monument is located immediately next to the sidewalk leading into the municipal building of the City of Bloomfield. (See App. Fig. 2). An objective observer going to pay his water bill, or merely driving by in his car, would associate the Monument with the government, and accordingly glean a message of endorsement which the Establishment Clause proscribes.

## 3. The circumstances of the Monument's financing and unveiling

If the Monument's content and position only hint at the City's endorsement, the circumstances of the approval, fundraising, and installation dispel any remaining doubt. In analyzing this context, we see strong parallels to our decision in Green v. Haskell County, where we found an Establishment Clause violation based on the government's conduct when a Ten Commandments monument was originally installed. 568 F.3d at 790–92, 795–808. First, like in Green, here Mauzy initially fundraised exclusively through local churches, rather than other local civic organizations. Id. at 790 (noting the Monument was sponsored by religious groups). Second, also as in Green, the dedication ceremony here was decidedly religious. Id. at 791 (observing that local pastors prayed with the audience and gave remarks). The occasion began with an invocation by a deacon of a local church, the flag-folding was set to religious narration, and Mauzy gave a speech riddled with Christian allusions, including an exhortation that "God and his Ten Commandments continue to protect us from our evil," and other similarly religious overtures. (Aplt. App. 465). Third, unlike in Green (which makes this an even clearer case), the Monument was originally approved and erected in isolation and began as the focus of the government's efforts.[6] The Supreme Court has told us that "[w]hen the government initiates an effort to place [the Ten Commandments] alone in public view, a religious object is unmistak-

---

5. We do not assess the endorsement effect from Plaintiffs' perspective, but rather from the view of an imaginary objective observer. Plaintiffs, however, are a good example of how public display of the Ten Commandments can risk making "outsiders" of "nonadherents." Lynch, 465 U.S. at 687, 104 S.Ct. 1355 (1984) (O'Connor, J., concurring).

6. While Mauzy proposed the Monument as the "start of a series," he did not initially seek permission to build any other monument, the City did not originally approve any other monuments, and Mauzy's fundraising efforts centered exclusively on the Ten Commandments. We believe an objective observer would glean a religious motivation from these circumstances.

able." McCreary, 545 U.S. at 869, 125 S.Ct. 2722; cf. ACLU of Ky. v. Mercer Cty., 432 F.3d 624, 638 (6th Cir. 2005) (finding no impermissible endorsement effect because the county "did not attempt to erect the monument in isolation ... before posting the ... display"). If a religious motivation is "unmistakable" merely when the Ten Commandments is erected alone, then there can be no doubt about the City's apparent motivations here when it not only installed the Monument in isolation, but also did so with the initial financial backing of religious organizations and unveiled the Monument at a religious ceremony. Any reasonable and objective observer would glean an apparent religious motivation from these circumstances.

### 4. The timing of this lawsuit

The timing of this lawsuit sheds light on whether a reasonable observer perceived Bloomfield's conduct as endorsing religion. The Supreme Court decided two separate Ten Commandments cases on the same day with different outcomes, and the "determinative" factor for the different outcomes appeared to be litigation timing. In Van Orden v. Perry, the Court upheld a Ten Commandments monument which had stood legally uncontested for forty years. 545 U.S. 677, 702, 125 S.Ct. 2854, 162 L.Ed.2d 607 (2005) (Breyer, J., concurring in the judgment). In McCreary County v. ACLU of Kentucky, on the other hand, the Court invalidated a Ten Commandments display which was challenged mere months after it was posted. 545 U.S. 844, 851–52, 881, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005). Justice Breyer, whose vote was the only one that changed in those cases, explained that the years of tranquility in Van Orden showed that "few individuals, whatever their system of beliefs, [were] likely to have understood the monument as amounting, in any significantly detrimental way, to a government effort to favor a particular religious sect, primarily to promote religion over nonreligion." Van Orden, 545 U.S. at 702, 125 S.Ct. 2854 (Breyer, J., concurring in the judgment). He said that case "differ[ed] from McCreary, where the short (and stormy) history of the courthouse Commandments' display demonstrates the substantially religious objectives of those who mounted them." Id. at 703, 125 S.Ct. 2854. This difference, he said, was "determinative." Id. at 702, 125 S.Ct. 2854.

The Tenth Circuit also found this to be a significant factor in Green, 568 F.3d at 806–07, where the plaintiff challenged the Ten Commandments display "less than one year after the Monument was unveiled." Id. at 807. We said the timing difference was "striking," and that the "prompt litigation response to the Monument" there added force to the conclusion that an objective observer viewed the display as a religious endorsement. Id. In our case, Plaintiffs here filed their lawsuit only seven months after the Monument was erected. In light of these Supreme Court and Tenth Circuit authorities, we conclude the timing factor weighs in Plaintiffs' favor.

### B. Mitigating Considerations

There are some considerations, however, that Bloomfield argues cut the other way. First, it contends a reasonable observer would attribute the message to Mauzy, not to Bloomfield. Second, even if the Monument's context suggests City endorsement, the disclaimer would dispel any connection between Bloomfield and the Monument's religious message. Third, the forum policy acted as a secularizing filter, so an objective observer would understand the City's motivation to be secular because the Monument was actually erected after the adoption of the policy. Fourth, the City installed other historical nonreligious monuments after erecting the

Ten Commandments, so an objective observer would have to "stare into the sun" to miss the secular message communicated by the display as a whole. (Aplt. Br. 73). We find these arguments unpersuasive.

### 1. Attributing the message to Bloomfield

 Whatever the nature of Mauzy's message, says Bloomfield, a reasonable observer would not attribute that message to the City. We disagree. First, as we explained earlier, when the government accepts a donated permanent monument and displays it on public property, it is adopting the message conveyed by that monument as the government's own speech. Pleasant Grove City v. Summum, 555 U.S. 460, 470–72, 129 S.Ct. 1125, 172 L.Ed.2d 853 (2009); id. at 471, 129 S.Ct. 1125 ("[P]ersons who observe donated monuments routinely—and reasonably—interpret them as conveying some message on the property owner's behalf."). Second, on these facts it was especially apparent that Mauzy's conduct enjoyed the City's imprimatur. As the Supreme Court reminded us, when a religious object is displayed in the "main" part of an important government building, "[n]o viewer could reasonably think that it occupies th[at] location without the support and approval of the government." Allegheny, 492 U.S. at 599–600, 109 S.Ct. 3086. Moreover, Mauzy was a city council member when the Ten Commandments was proposed and approved in 2007, even if his later actions were taken while he was a private citizen. The City knew of his motivation yet still approved the monument even over community members' objections at the 2007 city council meeting. The City also stood by its decision after local newspapers began publishing letters of dissent by community members, and it held firm again at the 2011 city council meeting over a present and objecting city council member. And finally, two active City Council members

donated to the monument's construction through their church. Thus, viewing all these circumstances together, an objective observer would fairly attribute Mauzy's religious message to the City.

### 2. The ineffectiveness of the disclaimers

It is true there are two disclaimers that purport to remove the City's endorsement—one etched into the tablet itself, and another on a freestanding sign near the Monument. Bloomfield says these signs prevent the impression that the City supports the Monument's religious message. Again, we disagree. First, we have held that a government's decision to allow placement of a religious display on public land "cannot be overshadowed by its attempts to distance itself from the message conveyed by [that] display[ ]." Am. Atheists, Inc. v. Davenport, 637 F.3d 1095, 1115–16 (10th Cir. 2010) (referring to a State's disclaimer that it "neither approves or disapproves the memorial marker," id. at 1112 (internal quotation marks omitted), in an Establishment Clause case about large memorial crosses erected on public land). So we are generally skeptical of a disclaimer's ability to negate the more powerful statement of endorsement conveyed by a decision to place the Monument on government land.

These particular disclaimers confirm our skepticism. The first disclaimer engraved into the granite tablet is small and inconspicuous; a reasonable observer might have to get on his knees and inspect closely to glean its content. (See App. Fig. 1). It is not unlike the rapid-fire warnings at the end of prescription drug commercials, where it is obvious the company has slipped them in as a barely audible afterthought just to comply with the rules. So too here. We accordingly give little effect to that disclaimer.

The second disclaimer is more prominent and contains more information, but its fate is no different. The text begins, "The City has intentionally opened up the lawn around City Hall as a public forum where local citizens can display monuments that reflect the City's history of law and government." (Aplt. App. 287). This sentence contains a reference both to the law-and-government theme of the lawn, and the lawn's character as a public forum. At the outset, we acknowledge the presence of other historical monuments here dampens the effect of endorsement—the presence of the Gettysburg Address, Declaration of Independence, and Bill of Rights could "change[ ] what viewers fairly understand to be the purpose of the display." Lynch v. Donnelly, 465 U.S. 668, 692, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring). As we explain more fully below, however, whatever offsetting effect these later-added monuments have does not negate the plainly religious message communicated by the Monument itself, its prominent location in front of a main government building, and the circumstances of its financing and unveiling. Moreover, the characterization of the lawn as a "public forum" belies the position we have taken in this opinion. Following the Supreme Court's command in Summum, we held public property displaying an essentially permanent monument is not a "public forum" as a matter of law. For the sign to claim otherwise, therefore, can have no legal significance.

The text of the disclaimer continues, "Any message contained on a monument does not *necessarily* reflect the opinions of the City, but are statements from private citizens." (Aplt. App. 287) (emphasis added). Again, Summum says otherwise, but even if an objective observer did not know that, this language is too equivocal to communicate a message of non-endorsement. A reasonable person would read this and understand the Monument's message

*might* reflect the City's views, just not "necessarily" so. Finally, the disclaimer says, "If you would like to display a monument in this forum, please contact the City Clerk, who can give you a copy of the ordinance that explains the procedures for displaying a monument." (Id.). This is an invitation in name only. There is no evidence that anyone except Mauzy has come forward to accept it, nor that nonadherents could readily muster the resources necessary to erect opposing monuments of acceptable size and grandeur to warrant placement on this property, nor even that there is remaining room on the lawn to accommodate more monuments—let alone available space to erect a monument that competes with the Ten Commandments for visibility.

Context reveals what the disclaimer's text attempts to obscure. The sign is not attached to any specific monument, rather it is a freestanding sign staked in the grass that refers, by its own terms, to all the monuments on the lawn. How can Bloomfield say the monuments, taken together, communicate the City's secular message about law and government, while also maintaining that the monuments do not express the City's views? We cannot reconcile those positions, and an objective observer reading this disclaimer would be similarly confused. Thus, the disclaimers offer no refuge to Bloomfield.

### 3. The forum policy does not negate the endorsement effect

The forum policy required monuments to "relate to the history and heritage of the City's law and government." (Aplt. App. 288). Therefore, all monuments approved under this policy, says Bloomfield, have the manifest purpose of advancing the City's history and government, not to endorse any religion. And critically, Bloomfield argues it adopted the forum policy before the Ten Commandments was finally approved and erected in 2011. But

as the district court properly noted, the 2011 approval of the Monument under the forum policy "occurred in the shadow" of the City's original 2007 approbation—which was *before* the adoption of the forum policy. (Aplt. App. 463). It was the Monument's original approval, the district court found, that likely prompted the forum policy in the first place. Because "reasonable observers have reasonable memories," McCreary, 545 U.S. at 866, 125 S.Ct. 2722, the religious purpose apparent from that 2007 approval—which occurred without the secularizing filter of the forum policy—would not be ignored. Furthermore, even if there were a secondary secular motive, that would not be inconsistent with the primary effect of religious endorsement conveyed by this particular monument. Therefore, this argument does not help Bloomfield.

#### 4. Adding secular monuments to the lawn did not cure the taint

The Ten Commandments monument was originally proposed, approved, financed, and erected in isolation.[7] But things changed. Shortly after the erection of the Ten Commandments, Bloomfield took actions that may have lessened the original endorsement effect conveyed by the initial apparent purpose and circumstances. After the Ten Commandments stood alone on the lawn, the City approved Mauzy's request for subsequent monuments depicting the Declaration of Independence, the Bill of Rights, and the Gettysburg Address. These additions could potentially be seen as "curative" measures by signaling to the objective observer that no religious endorsement is intended.[8]

We begin by acknowledging that curative actions can be considered in determining whether a permanent monument has lost its initial religious effect due to subsequent events surrounding and impacting that monument. See McCreary Cty. v. ACLU, 545 U.S. 844, 873–74, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005). In McCreary, the government erected a Ten

7. Mauzy proposed it would be the "start of a series," (Aplt. App. 283), but as explained above, other context considerations suggest it was the sole focus of the City and Mauzy at the time it was installed.

8. There is another kind of change not implicated here, but worthy of mentioning. It is the kind of change wrought by the secularizing passage of time, which itself can be a curative palliative. Laurence H. Tribe, American Constitutional Law 1294-96 (2d ed. 1988) (citing examples where "history had removed the religious significance" of various traditions). Community attitudes evolve and people come to view a symbol differently, even if the emblem itself is unchanged. See ACLU of Ill. v. City of St. Charles, 794 F.2d 265, 271 (7th Cir 1986) (citing the holly wreath, the Christmas tree, and the five-pointed star as examples of originally religious symbols which "have lost their Christian connotations"). Christmas wreaths are a good example—once representing the Crown of Thorns worn by Jesus Christ at his crucifixion, id. but now a common holiday decorative hanging. Acknowledging that "the interpretation of a monument can evolve" over time, the Supreme Court cited the Statue of Liberty as an example which had first been merely a symbol of international friendship, but had morphed into a global icon of freedom and opportunity. Summum, 555 U.S. at 477, 129 S.Ct. 1125. While the Ten Commandments may have evolved in some respects—having secured an important role in our Nation's heritage—it has not lost its fundamentally religious character. See Van Orden, 545 U.S. at 688, 125 S.Ct. 2854 (2005) (plurality opinion) (acknowledging the "role played by the Ten Commandments in our Nation's heritage"); id. at 690, 125 S.Ct. 2854 ("Of course, the Ten Commandments are religious—they were so viewed at their inception and so remain."). Therefore, we instead address a different kind of change: the kind that occurs more rapidly, and does not involve shifting community attitudes, but rather is a change in government motivations or in the presentation of the disputed religious display itself.

Commandments display—with no accompanying secular objects—in a manner that impermissibly endorsed religion. Id. at 850, 866, 125 S.Ct. 2722. The government then attempted to cure the taint of that endorsement by adding other secular objects to the display (including the Magna Carta, Declaration of Independence, state constitution, and others), and entitled the collection "The Foundations of American Law and Government Display." Id. at 856, 125 S.Ct. 2722. The Supreme Court did "not decide that the Counties' past actions forever taint any effort on their part to deal with the subject matter." Id. at 873, 125 S.Ct. 2722. Rather, it acknowledged that "courts are fully capable of adjusting ... relief to take account of genuine changes in constitutionally significant conditions." Id. at 874, 125 S.Ct. 2722 (citing Ashcroft v. ACLU, 542 U.S. 656, 124 S.Ct. 2783, 159 L.Ed.2d 690 (2004) (noting the district court could account for changes in the legal and technological landscape of the Internet in assessing a First Amendment challenge)). In other words, it is possible that a government may begin with an impermissible purpose, or create an unconstitutional effect, but later take affirmative actions to neutralize the endorsement message so that "adherence to a religion [is not] relevant in any way to a person's standing in the political community." E.g., Lynch v. Donnelly, 465 U.S. 668, 687, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring); see also Books v. City of Elkhart, 235 F.3d 292, 304 (7th Cir. 2000) (asking whether "the subsequent history of the [Ten Commandments] monument can be said to have in any way transformed [its] religious purpose").

While recognizing the possibility of curative action, the McCreary Court dismissed the government's curative measures there as insufficient to negate the initial endorsement of religion. 545 U.S. at 873–74, 125 S.Ct. 2722. It held that an objective observer "would probably suspect that the [government was] simply reaching for any way to keep a religious document on the walls [that are] constitutionally required to embody religious neutrality." Id. at 873, 125 S.Ct. 2722 The later addition of nonreligious items did not create "a clear theme that might prevail over evidence of the continuing religious object," and accordingly "[n]o reasonable observer could swallow the claim that the [government] had cast off the objective so unmistakable in the earlier display[ ]." Id. at 872, 125 S.Ct. 2722. From that case, we understand the inquiry to be whether curative efforts are sufficient to overcome an objective observer's impression that the display, considered in its full historical context, is a government endorsement of religion. Moreover, because the "endorsement" test asks whether government conduct has the "principal or primary" effect of endorsing religion, Green, 568 F.3d at 796–97, the standard for curative actions should be sufficient not only to persuasively present a primary nonreligious effect, but also to disassociate the monument from its previous religious effect. Accordingly, such curative measures should be sufficient to persuade an objective observer that the government's "principal or primary" message is nonreligious.

 What would be enough to meet this standard? The case law does not yield a ready answer. But from the above principles we conclude that a government cure should be (1) purposeful, (2) public, and (3) at least as persuasive as the initial endorsement of religion. It should be purposeful enough for an objective observer to know, unequivocally, that the government does not endorse religion. It should be public enough so that people need not burrow into a difficult-to-access legislative record for evidence to assure themselves that the government is not endorsing a

religious view. And it should be persuasive enough to countermand the preexisting message of religious endorsement.

We cannot speculate what precise actions a government must take. But we are satisfied here that Bloomfield has not undertaken sufficiently purposeful, public, and persuasive actions to secularize the Monument's previous "principal or primary" religious message. The City has never explicitly said this Monument was not for religious purposes, nor that it was exhibited only for its historical significance.[9] It has not explained why the Ten Commandments tablet belongs with the other secular monuments. It has not signaled that it would reconsider the Monument in the face of controversy. In fact, it has taken no public, purposeful, and persuasive action to distance itself from the sponsor and his message other than two ineffective disclaimers—one small, the other vague. The only meaningful public action Bloomfield undertook was to add secular monuments around the Ten Commandments. But McCreary found that to be insufficient, and we agree.

It is true a cluster of other monuments surrounding the Ten Commandments can dampen the effect of endorsement. See Van Orden, 545 U.S. at 701–02, 125 S.Ct. 2854 (Breyer, J., concurring in the judgment) (finding significant that the Ten Commandments was surrounded by seventeen secular monuments and twenty-one historical markers, which suggests the State intended the "nonreligious aspects of the tablets' message to predominate"). That makes sense, because when the government integrates the Ten Commandments into a unified secular display containing other nonreligious objects, it "changes what viewers may fairly understand to be the purpose of the display[.]"

Lynch, 465 U.S. at 692, 104 S.Ct. 1355 (O'Connor, J., concurring) (finding the placement of a crèche among other secular symbols of Christmas neutralized the religious endorsement effect). In light of this mitigating effect, as noted earlier, we credit the City's effort to place the Ten Commandments in the company of other historical artifacts suggesting a law-and-government theme.

But that is not enough on its own. Cf. Green, 568 F.3d at 788–89 (finding impermissible religious endorsement even when the Ten Commandments resided on a lawn with other nonreligious historical monuments, e.g., war memorials); Books v. City of Elkhart, 235 F.3d 292, 294–96 (7th Cir. 2000) (finding endorsement even when the Ten Commandments stood on a lawn with two other secular historical monuments, and over a dissent that specifically argued these other monuments diluted the religious tablet's endorsement effect, see id. at 317 (Manion, J., dissenting)). And it was especially inadequate here because of the plain religious motivations apparent from the approval (approved alone), financing (sponsored entirely by churches), and unveiling (ceremony rife with Christian allusions) of the Monument. In light of those considerations, and the situational context of the Ten Commandments on the lawn, the City would have to do more than merely add a few secular monuments in order to signal to objective observers a "principal or primary" message of neutrality. Thus the impermissible taint of endorsement remains, and as we have said, nothing sufficiently purposeful, public, and persuasive was done to cure it.

## CONCLUSION

Because we find an impermissible effect of endorsement that is insufficiently mitigated by curative efforts, we AFFIRM.

9. As discussed above, the forum policy and the disclaimer referring to the lawn's histori-cal artifacts of law and government do not accomplish this.

Attachment

Figure 1

Figure 2

Figure 3