**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 6, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

JANE FELIX; B.N. COONE,

    Plaintiffs - Appellees,

v.

CITY OF BLOOMFIELD,

    Defendant - Appellant.

------------------------------

LIBERTY COUNSEL,

    Amicus Curiae.

No. 14-2149
(D.C. No. 1:12-CV-00125-JAP-RHS)
(D. N.M.)

_____

**ORDER**
_____

Before **TYMKOVICH**, Chief Judge, **KELLY**, **BRISCOE**, **LUCERO**, **HOLMES**, **MATHESON**, **BACHARACH**, **PHILLIPS**, **McHUGH**, and **MORITZ**, Circuit Judges.[*]
_____

    This matter is before the court on the appellant's *Petition for Rehearing En Banc*.

We also have a response from the appellees. Both the petition and response were

circulated to all the active judges of the court who are not disqualified. *See* Fed. R. App.

P. 35(a).

---

[*] The Honorable Harris L Hartz is recused and did not participate in consideration of this petition. The Honorable Neil M. Gorsuch considered the petition and response upon circulation, but did not participate in the final issuance of this order.

Upon consideration, a poll was called, and a majority voted to deny the request for en banc rehearing. Accordingly, the petition is denied.

Chief Judge Tymkovich and Judge Kelly voted to grant en banc rehearing and Judge Kelly has written separately in dissent. Chief Judge Tymkovich joins that dissent.

Entered for the Court

ELISABETH A. SHUMAKER, Clerk

No. 14-2149, Felix v. City of Bloomfield.

**KELLY**, Circuit Judge, dissenting from the denial of rehearing en banc, joined by **TYMKOVICH**, Chief Circuit Judge.

This decision continues the error of our Establishment Clause cases. It does not align with the historical understanding of an "establishment of religion" and thus with what the First Amendment actually prohibits. It also applies the wrong test, despite guidance by the Supreme Court that the Lemon / endorsement test is "not useful in dealing with [a] passive monument" such as the one at issue here. Van Orden v. Perry, 545 U.S. 677, 686 (2005) (plurality opinion); see also id. at 700 (Breyer, J., concurring).

A.   Defining Establishment

1.   *Establishment in Europe, the American Colonies, and Post-Revolution America*

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. To make sense of the Establishment Clause, one must understand the historical background that informed the Framers' use of the word "establishment." In Europe, the continent of origin for most American colonists, each country had long established its own state church — a generalized version of cuius regio, eius religio[1] — over which each government exercised varying degrees of control. Germany and Scandinavia had official Lutheran establishments; Holland, a Reformed state church; France, the Gallican Catholic Church; Ireland, the Church of Ireland; Scotland, the Church of Scotland; and so on.

---

[1] "Whose realm, his religion."

Broadly speaking, during and after the Reformation, "all the territorial national churches, Anglican as well as Lutheran, Catholic as well as Orthodox, fell under the caesaropapist control of the absolutist state." José Casanova, Public Religions in the Modern World 22 (1994).

In England, the church-state arrangement took the form of Erastianism, named for the 16th-century theologian Thomas Erastus who advanced a theory of civil authority over the power of the Church. Under Erastianism, "the monarch was the supreme head of the Church; Parliament controlled the liturgy and articles of faith; the government appointed the bishops; [and] government offices were confined to members of the Church." Michael W. McConnell, Establishment and Disestablishment at the Founding, Part I: Establishment of Religion, 44 Wm. & Mary L. Rev. 2105, 2189 (2003). Establishment was a one-way street: the government controlled the Church, not the other way around. As for the religious liberty of dissenters, though the Toleration Act of 1688 removed some of the criminal penalties against trinitarian nonconformists such as Baptists and Congregationalists, it left in place the favored position of the Church of England, as well as criminal penalties against Catholic, Jewish, and Unitarian dissenters. See id. at 2114; see also Michael W. McConnell, The Origins and Historical Understanding of Free Exercise of Religion, 103 Harv. L. Rev. 1409, 1421–22 (1990). This arrangement prevailed in England for most of the 18th century.

Establishment was also the norm in the American Colonies. Exclusive Anglican establishments reigned in the southern states, whereas localized Puritan establishments

were the norm in New England, with the exception of Rhode Island.  See McConnell, Establishment, supra, at 2115.  Although the particularities of each establishment differed from colony to colony (even within these two broad categories), there were certain commonalities that existed across the board.  Professor McConnell has summarized the general features of most establishments: "(1) [state] control over doctrine, governance, and personnel of the church; (2) compulsory church attendance; (3) financial support; (4) prohibitions on worship in dissenting churches; (5) use of church institutions for public functions; and (6) restriction of political participation to members of the established church."  Id. at 2131.  Very generally, the existence of these elements provides a good starting point in understanding the public meaning of "establishment" in pre-Revolution America.

After the Revolution, some things changed.  The Church of England was disestablished, if only because Americans could not have as head of their church the King of England from whom they had just gained independence.  See Michael W. McConnell, Religion and Its Relation to Limited Government, 33 Harv. J.L. & Pub. Pol'y 943, 946 (2010).  And shortly after the end of the war, Virginia enacted its Bill for Establishing Religious Freedom, completely disestablishing its church.  McConnell, Establishment, supra, at 2120.  The majority of other states, however, continued their practices of establishment.  Vermont, Connecticut, New Hampshire, and Massachusetts required citizens to pay taxes to support a (Protestant) church or religious institution, but provided some freedom as to how citizens could direct those funds.  Id. at 2157–59.  (These

establishments all survived the passing of the Constitution and the Bill of Rights, with disestablishment coming to Vermont in 1807, Connecticut in 1818, New Hampshire in 1819, and Massachusetts in 1833. See id. at 2126, 2157–59.) Maryland, South Carolina, and Georgia had more general establishments embedded in their state constitutions. See Akhil Reed Amar, Some Notes on the Establishment Clause, 2 Roger Williams U. L. Rev. 1, 2 (1996). Even states without official churches aided and promoted religion, and most had religious qualifications for holding office. Id.

In the 1780s, those who encouraged governmental aid of religion generally offered republican, not necessarily theological, reasons for their support. For example, the Massachusetts Constitution of 1780 premised that "the happiness of a people and the good order and preservation of civil government essentially depend upon piety, religion, and morality," and therefore established "the institution of the public worship of God and of public instructions in piety, religion, and morality." Mass. Const. of 1780, art. III. Opponents and religious dissenters, on the other hand, were concerned that an official establishment, even if good for civic virtue, would come at the cost of free exercise and true religion. In other words, they feared the one-way governmental control over the church reminiscent of the Erastianism they had left in England. See, e.g., Steven D. Smith, The Establishment Clause and the "Problem of the Church," in Challenges to Religious Liberty in the Twenty-First Century 3, 8 (Gerard V. Bradley ed., 2012) [hereinafter Smith, Establishment Clause] ("[A]t least with respect to the national government, [early Americans] renounced the Erastian claim, thereby disclaiming power

-4-

over the church . . . .").

2.     *Crafting the First Amendment*

When the First Congress met in 1789 to craft a Bill of Rights, it is safe to say that the relationship between church and state was far from settled. Some states continued their established churches and other mechanisms of state support; others were headed in the opposite direction. This contrast in opinion was reflected in the differing statements that came out of the states' ratifying conventions that formed the initial proposals for the Bill of Rights. See generally Steven D. Smith, The Jurisdictional Establishment Clause: A Reappraisal, 81 Notre Dame L. Rev. 1843, 1845–58 (2006). Virginia and New York submitted similar "no preference" proposals that said, in the words of the New York Declaration, "That the People have an equal, natural and unalienable right, freely and peaceably to Exercise their Religion according to the dictates of Conscience, and that no Religious Sect or Society ought to be favoured or established by Law in preference of others." Ratification of the Constitution by the State of New York, July 26, 1788, reprinted in Yale Law School Avalon Project, http://avalon.law.yale.edu/18th_century/ratny.asp. In contrast, New Hampshire offered a more jurisdictional suggestion: "Congress shall make no Laws touching religion, or to infringe the rights of Conscience." Ratification of the Constitution by the State of New Hampshire, June 21, 1788, reprinted in Yale Law School Avalon Project, http://avalon.law.yale.edu/18th_century/ratnh.asp.

That the First Congress eventually settled on other language — "Congress shall

make no law respecting an establishment of religion, or prohibiting the free exercise thereof" — has been the source of much academic and judicial debate.  E.g., Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 45 (2004) (Thomas, J., concurring) (advancing federalism argument); Lee v. Weisman, 505 U.S. 577, 612–16 (1992) (Souter, J., concurring) (advancing "strict-separationist" theory); Wallace v. Jaffree, 472 U.S. 38, 113 (1985) (Rehnquist, J., dissenting) (advancing "non-preferentialist" interpretation).  From the words of the text, though, two conclusions are relatively clear: first, the provision originally limited the federal government and not the states, many of which continued to support established churches; and second, the limitation respected only an actual "establishment of religion."  As Justice Story reported, "[t]he real object of the [First] Amendment was . . . to prevent any national ecclesiastical establishment, which should give to an hierarchy the exclusive patronage of the national government."  3 Joseph Story, Commentaries on the Constitution of the United States 728 (1833), quoted in Lynch v. Donnelly, 465 U.S. 668, 678 (1984); see also McConnell, Establishment, supra, at 2109 ("Contrary to popular myth, the First Amendment did not disestablish anything.  It prevented the newly formed federal government from establishing religion or from interfering in the religious establishments of the states.").

In this way, both the pro-establishment and the anti-establishment camps got more or less what they wanted.  Because the national government was prohibited from establishing a religion, Massachusetts, for instance, was free to continue its religious sponsorship, while Virginia could more fully disestablish.  Both objectives comport with

the common understanding of what "establishment" meant at the time: state control over the Church, not the other way around. Hence Jefferson's "wall of separation between church and state," which made the distinction between church and state, not between all religion and government. Smith, Establishment Clause, supra, at 3. As Steven D. Smith nicely summarizes, Jefferson's "language hardly suggests a demand for a thoroughly secular government. But it is nicely congruent with the interpretation of the establishment clause as a disclaimer of Erastian power over the church." Id. at 16.[2]

This distinction between religion generally and the church specifically also makes sense in light of the historical practices of the First Congress. On the same day the House of Representatives voted to "make no law respecting an establishment of religion," it then proposed a resolution requesting President George Washington to set aside a "day of public humiliation and prayer" in his Thanksgiving Day Proclamation. See J. Clifford Wallace, The Framers' Establishment Clause: How High the Wall?, 2001 BYU L. Rev.

_____

[2] Admittedly, this interpretation glosses over many of the complexities of Jefferson's letter to the Danbury Baptist Association, from which the famous line comes. See Letter from Thomas Jefferson to the Danbury Baptist Association (Jan. 1, 1802), in 36 The Papers of Thomas Jefferson 258 (Barbara B. Oberg ed., 2009), available at https://jeffersonpapers.princeton.edu/selected-documents/danbury-baptist-association-0. The explanation is likely consistent, however, with the general understanding of establishment when the First Amendment was crafted in 1789, even if it does not fully capture the political meaning of the letter at the time it was written — in 1802. See, e.g., Philip Hamburger, Separation of Church and State 109–29 (2002) (explaining how the idea of strict separation was introduced in the tumultuous election of 1800 as a way for Jeffersonian-Republicans "simultaneously to attract antiestablishment votes and to browbeat Federalist clergy for preaching about politics," id. at 111); cf. Daniel L. Dreisbach & John D. Whaley, What the Wall Separates: A Debate on Thomas Jefferson's "Wall of Separation" Metaphor, 16 Const. Comment. 627 (1999) (debating the meaning of Jefferson's letter and its relation to the Establishment Clause).

755, 764–65 (2001). One member from South Carolina objected, arguing that the legislation "is a religious matter, and, as such, is proscribed by us," id. at 764 (quoting statement of Thomas Tudor Tucker), but the resolution still carried a great majority. Indeed, "[o]ur history is replete with official references to the value and invocation of Divine guidance" in official proceedings. Lynch, 465 U.S. at 676–77; see also Van Orden, 545 U.S. at 686–90 (listing instances of official recognition of the role of religion in the nation's life); McCreary Cty. v. ACLU of Ky., 545 U.S. 844, 886–89, 906–07 (2005) (Scalia, J., dissenting) (same).

B.      Limiting *Lemon*

This examination of the historical understanding of the First Amendment aligns with current Supreme Court practice. In Town of Greece v. Galloway, for instance, the Court reversed the Second Circuit's use of the endorsement test in a public prayer case, underscoring instead that "the Establishment Clause must be interpreted 'by reference to historical practices and understandings.'" 134 S. Ct. 1811, 1819 (2014) (citations omitted). This was not because the Court sought to "permit[] a practice that would amount to a constitutional violation if not for its historical foundation," id., but rather because the Court understood that historical practices of the First Congress that constituted "a benign acknowledgment of religion's role in society" informed the inquiry about the contours of the Establishment Clause. Id.

Nor is this turn to history unique to legislative-prayer cases such as Town of Greece or Marsh v. Chambers, 463 U.S. 783 (1983). Although the Court used the Lemon

-8-

test in McCreary County, 545 U.S. at 859–60, it then specifically avoided Lemon's

application in the contemporaneous case of Van Orden, there explaining that its analysis

of Texas's decalogue display was "driven both by the nature of the monument and by our

Nation's history." 545 U.S. at 686 (plurality opinion); see also id. at 699–700 (Breyer, J.,

concurring). Other circuits have rightly interpreted this to mean that Van Orden

announced a deviation from Lemon's applicability for certain displays. See Card v. City

of Everett, 520 F.3d 1009, 1018 (9th Cir. 2008) (applying Justice Breyer's controlling

concurrence in Van Orden, which "carv[ed] out an exception" from Lemon); ACLU Neb.

Found. v. City of Plattsmouth, 419 F.3d 772, 778 n.8 (8th Cir. 2005) (en banc) ("Taking

our cue from Chief Justice Rehnquist's opinion for the Court and Justice Breyer's

concurring opinion in Van Orden, we do not apply the Lemon test."). As the Ninth

Circuit has observed, it probably is unnecessary to define the outer limits of this

exception, but it "at least includes the display of the Ten Commandments at issue here."

Card, 520 F.3d at 1018.[3]

_____

[3] In Card, the Ninth Circuit found that its case fit within the Van Orden orbit rather than McCreary County's. In doing so, the court emphasized that it was the "[c]ity's intent [that] is the key," not simply that of the private donor; rejected the argument that the presence of clergy at the dedication ceremony doomed the display, since the religious ceremony was not the city's doing; noted that the monument bore an inscription saying that it was donated by a private organization; and described the monument's setting as part of a collection of three war monoliths and one plaque. 520 F.3d at 1019–21. With the exception of one other factor — the length of time between the monument's installation and a legal challenge — that case could be ours.

This is in contrast to the facts of McCreary County, where the decalogue displays were created by the counties, not by private organizations (or, as here, a formerly-public but now private citizen); where the displays were housed in the courthouse, not in a

Such a change is especially warranted in our circuit, where we combine Lemon with an endorsement spin that is tantamount to a hostile "reasonable observer." Though we state that there is no presumption of invalidity for religious displays, see Green v. Haskell Cty. Bd. of Comm'rs, 568 F.3d 784, 798–99 (10th Cir. 2009), and that any "taint" of religion can be "cured," Felix v. City of Bloomfield, 841 F.3d 848, 862–63 (10th Cir. 2016), that may be in theory only. A truly reasonable observer could be forgiven for wondering whether there exists a gap between the test we purport to apply and a more stringent one we secretly require. For instance, the panel opinion emphasizes that a city must make "sufficiently purposeful, public, and persuasive actions" to overcome any religious message, id. at 864, and then provides examples of such remediation: accompanying the monument with other secular markers, id., avoiding religious ceremonies when unveiling the monument, id. at 858–59, and displaying clear disclaimers, id. at 860–61.[4]

---

public park or lawn; where the dedication ceremony was religious in nature and presided over by a county judge-executive, not by private citizens; where the Ten Commandments were first set alone, and then — after the counties had been sued — accompanied by eight other documents, "each either having a religious theme or excerpted to highlight a religious element," and only later by certain other historical documents; and so on. See 545 U.S. at 851–58. Suffice it to say, these facts are not our facts.

[4] Other suggestions for overcoming our non-presumption may include: (1) making a public legislative pronouncement about the secular purpose of the monument; (2) using disclaimers that avoid the possibility that the city "might" support the monument's message; (3) offering a substantive public explanation about how the Ten Commandments fit into the city's history; and (4) ensuring that the Ten Commandments never stand alone, but only come into being already surrounded by secular displays. Of course, such steps seem more in line with remedying an ongoing constitutional violation than making the call in the first instance.

Yet the City of Bloomfield did each of those things. It accompanied the monument with secular markers such as the Declaration of Independence, the Bill of Rights, and the Gettysburg Address. Id. at 862. It avoided a government-sponsored or government-led religious ceremony at the unveiling, instead allowing private persons to run the event. Id. at 853. And it provided not one but two disclaimers, one on the monument itself and one on a freestanding sign on the City Hall lawn. Id. at 852–53. What more should the City have done, besides not having a Ten Commandments display at all? At a minimum, there seems to be a difference between the language we use to discuss how a city can "cure" the "taint" and the factual second-guessing we undertake in determining that no attempted cure we have seen has been effective. Cf. Green v. Haskell Cty. Bd. of Comm'rs, 574 F.3d 1235, 1243–49 (10th Cir. 2009) (Gorsuch, J., dissenting from denial of rehearing en banc) (outlining the many mistakes of our "reasonable observer"). Though this court may view the placement of the Ten Commandments as unwise, unnecessary, or even aesthetically displeasing, cf. id. at 1237–38 (Kelly, J., dissenting from denial of rehearing en banc), we should defer to local government decisions absent an actual violation of the First Amendment.

C.    Moving Forward

It is time we reexamine our Establishment Clause cases. The Supreme Court has "often noted that actions taken by the First Congress are presumptively consistent with the Bill of Rights." Town of Greece, 134 S. Ct. at 1834 (Alito, J., concurring). Those actions often took the form of supporting religion generally but never establishing an

official religion or church.  Accordingly, this distinction should inform our understanding of what the First Amendment allows, and what it does not.

As applied to modern cases, these historical measures demonstrate that the Establishment Clause should not be an impediment to certain, limited government displays of a religious nature.[5]  This is especially true when, as in the case of national days of prayer or with public monuments of a religious nature, the governmental action helps to promote, instead of inhibit, citizens' free exercise of religion.

More particularly, the public display of memorials with historical significance should generally not be construed as an "establishment of religion," even if one of the monuments also happens to be religious in nature.  Here, the City of Bloomfield was not exercising control over the doctrine, governance, or personnel of a church; it was not compelling church attendance; it was not financially supporting a church or particular denomination; it was not inhibiting worship in any way; it was not using a church institution for public goals; and it was not restricting political participation to members of an established church.  In short, the City's behavior met none of the traditional elements

_____

[5]  Again, "[o]n modern interpretations that have seen the establishment clause as separating government from *religion*, these actions [by the First Congress endorsing religion] seemed suspect at best.  It looks as if Congress was committing the national government to keep out of religion while at the same time blatantly and brazenly violating that commitment.  But although decades later Madison expressed doubts, at the time there seems to have been no sense that Congress was acting contrary to principles it was simultaneously drafting and enacting. . . .  [T]hat attitude seems perfectly appropriate.  The establishment clause was about keeping the national government from exercising power over *churches*.  Legislative prayer and a national day of thanksgiving are clearly *religious* expressions or gestures, but these actions do not seem to entail any sort of interference with *churches*."  Smith, Establishment Clause, supra, at 14.

of what the original public meaning of "establishment" likely meant.  Cf. McConnell, Establishment, supra, at 2131.

Though the Ten Commandments are of course religious — "they were so viewed at their inception and so remain" — "[s]imply having religious content or promoting a message consistent with a religious doctrine does not run afoul of the Establishment Clause."  Van Orden, 545 U.S. at 690.  This should be especially true in cases such as this one, when the religious message is non-sectarian, being generally accepted by Judaism, Christianity, and Islam alike.  See McCreary Cty., 545 U.S. at 909 (Scalia, J., dissenting).

\* \* \*

Our cases should further the meaning of the Establishment Clause as it was understood by the Framers.  This case presented a good opportunity to take another look at the map and reverse course.  Though returning to a more historically-congruent understanding of the Establishment Clause is the ultimate province of the Supreme Court, there is much we could have done to correct our law in this area while still operating within the proper boundaries of an inferior court.  Accordingly, I respectfully dissent from the denial of rehearing en banc.